955 F.2d 571
 Patrick McBRIDE and Sonya McBride, Appellees,
v.
Dwight COLEMAN, Lester Crowsheart, Sharon Crowsheart, Russel
Folmer, Anna Mae Folmer, George Hatfield, June Hatfield,
Donna McCabe, Diane McCabe, on behalf of themselves and
others similarly situated, Gary A. Barrett, Rosemary K.
Barrett, Richard L. Harmon, Betty J. Harmon, Larry L.
Robertson, Nancy K. Robertson, Ross Wade and Maureen Wade,
v.
Clayton YEUTTER, Secretary of Agriculture, Charles W.
Shuman, Administrator of the Farmers Home Administration,
Ralph W. Leet, State Director of the Farmers Home
Administration; Harold T. Aasmundstad, Glen W. Binegar,
Allen G. Drege, Dennis W. Larson, Odell O. Ottmar, and
Joseph J. Schneider, as District Directors of the Farmers
Home Administration of North Dakota; Samuel Delvo, Lorace
Hakanson, Larry Leier, Charles Schaefer and James Well as
County Supervisors of the Farmers Home Administration in
North Dakota, David Marshall, Dwight Sewell and Steve
Taylor, Appellants.
 No. 89-5135.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1990.
Decided Jan. 30, 1992.
Rehearing and Rehearing En Banc Denied March 18, 1992.
 
 Michael Robinson, Washington, D.C., argued (Stuart E. Schiffer, H. Gary Annear, Robert S. Greenspan and Robert K. Rasmussen, on the brief), for appellants.
 Anthony P. Shusta, Madison, Me., argued, for appellees.
 Before LAY,* Chief Judge, BOWMAN and WOLLMAN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 The Secretary of Agriculture and two employees of the Department of Agriculture appeal an order of the District Court finding them in civil contempt and awarding compensatory damages, attorney fees, and costs. We affirm in part and reverse in part.
 
 I.
 
 2
 This proceeding is ancillary to a nationwide class action, Coleman v. Block, which challenged the Farmers Home Administration's (FmHA) loan liquidation foreclosure procedures on statutory and constitutional grounds.[1] The District Court's nationwide preliminary injunction in Coleman v. Block was filed on November 14, 1983 and required the FmHA, inter alia, to give at least thirty days notice of its loan deferral program, see 7 U.S.C. § 1981a (1988), before demanding voluntary conveyance by a farmer or depriving a farmer of property in which the agency has a security interest. Coleman v. Block, 580 F.Supp. 192, 193-94 (D.N.D.1983). The injunction was made permanent in Coleman v. Block, 580 F.Supp. 194, 210-12 (D.N.D.1984), and was vacated as moot (because of the enactment of the Agricultural Credit Act of 1987) in Coleman v. Lyng, 864 F.2d 604 (8th Cir.1988), cert. denied, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 351 (1989).
 
 
 3
 During 1973 and 1974, Patrick and Sonya McBride decided to enter the poultry farming business in Maine. They located a suitable farm and began planning for construction of a broiler barn. In order to finance these plans, the McBrides went to Skowhegan Savings Bank (the Bank) and received a $40,000.00 real estate loan that was secured by a first mortgage on the realty. The FmHA also agreed to provide the McBrides with a $94,000.00 construction loan and a $29,000.00 operating loan for equipment. The FmHA received a second mortgage on the realty.[2] When completed, the farm contained such amenities as a swimming pool and a horse barn.
 
 
 4
 In 1981, the poultry business in Maine collapsed. Although the McBrides ceased making payments on their loans, neither the Bank nor the FmHA foreclosed immediately. Ultimately, by certified letter dated June 4, 1982, the Bank informed the McBrides that it was necessary to proceed with foreclosure. Although the record indicates that Sonya McBride's mother had a sum of money sufficient to pay off the mortgage to the Bank, and offered it to the McBrides for that purpose, the McBrides did not avail themselves of her offer, at least in part because of certain assurances, which we will come to momentarily, given them by one of the defendants.
 
 
 5
 The couple arranged a meeting at their home on June 11, 1982 with various FmHA officials, including Dwight Sewell, the State Director of the FmHA in Maine, and Steve Taylor, the McBrides' FmHA county agent. While those present discussed a number of possible options, ultimately nothing was resolved. The next meeting took place in Taylor's office on June 29, 1982. When again nothing was resolved, the McBrides contacted Sewell to discuss their financial situation. Sewell directed them to work with Taylor.
 
 
 6
 The McBrides met with Taylor a third time on July 22, 1982 and notified him that the Bank intended to proceed with the foreclosure. While the parties dispute the events of the meeting, the McBrides claim that Taylor advised them to allow the Bank to continue with the foreclosure procedure and assured them that the FmHA would purchase the mortgage and thereafter would work with them. The McBrides say that based on these assurances they declined to use the money then available from Sonya McBride's mother to pay off the Bank mortgage. In any event, after this meeting the McBrides instructed the Bank to proceed with foreclosure.
 
 
 7
 The Bank filed an action for foreclosure on October 13, 1982 and obtained a judgment of foreclosure on January 14, 1983, at which time the statutory one-year period of redemption began to run. In February 1983, with Taylor's knowledge, the McBrides began growing replacement chickens on their farm for Dorothy Egg Farms.
 
 
 8
 As previously noted, the District Court's nationwide preliminary injunction in Coleman v. Block issued on November 14, 1983. Coleman v. Block, 580 F.Supp. 192 (D.N.D.1983). On November 23, 1983, Sewell began a program of notice to field officers regarding that order. The injunction was made permanent on February 17, 1984.
 
 
 9
 The McBrides again visited Taylor on February 16, 1984. At this meeting, Taylor explained to the McBrides that they could either voluntarily convey the property to the FmHA and extinguish their debt or be foreclosed and owe any unliquidated balance. He also mentioned the possibility of refinancing upon proof of the McBrides' arrangement with Dorothy Egg Farms. The McBrides contacted Sewell, who confirmed these suggestions and referred them back to Taylor.
 
 
 10
 Shortly thereafter, the McBrides telephoned Taylor and directed him to prepare the conveyance documents. Taylor did so, and, on February 21, 1984, the McBrides executed an offer for a voluntary conveyance to the FmHA.[3] Taylor says that a pretermination notice package prepared in response to the Coleman v. Block injunction was included with the conveyance documents; the McBrides say they have no recollection of any such notice.
 
 
 11
 After the documents were signed, the state FmHA office added a notation to the effect that the FmHA would accept the McBrides' offer of voluntary conveyance if it received marketable title. On or about February 27, 1984, Taylor informed the McBrides that their offer was rejected as the impending judicial sale of their property prevented the FmHA from receiving marketable title. The Bank's foreclosure sale was held March 1, 1984, at which time the FmHA as junior lienholder bought the land for $51,875.37. On July 2, 1984, the FmHA sold the business fixtures for $8,990.00 and the real estate for $60,000.00.
 
 
 12
 On April 25, 1986, the McBrides filed a motion to find contempt against the United States Department of Agriculture, the Secretary of Agriculture, and various FmHA officials, including Taylor and Sewell. Following an evidentiary hearing, the District Court, in a memorandum and order filed January 4, 1989, concluded that Taylor and Sewell had violated the Coleman v. Block injunction by failing to give the McBrides adequate and meaningful notice of the loan deferral program before depriving them of property in which the FmHA had only a security, not a possessory, interest and before demanding voluntary conveyance. It further found the Secretary of Agriculture to be in contempt based upon a respondeat superior theory.[4]
 
 
 13
 In reaching its decision, the District Court recognized that actions that occurred prior to the issuance of its preliminary injunction in Coleman could not be in violation of the injunction. It also took the view, however, that such "actions may be relevant as coloring or confirming actions taken or statements made after [the issuance of the preliminary injunction]." McBride v. Lyng, No. A1-83-47-09, slip op. at 12 (D.N.D. Jan. 4, 1989) (hereinafter "Memorandum and Order"). Upon examining the conduct of Taylor and Sewell both before and after the issuance of the preliminary injunction in Coleman, the court concluded that they not only had violated the injunction, but "elemental principles of contract law" as well. Memorandum and Order at 15. In addition, the court also found that in demanding that the McBrides make a voluntary conveyance Taylor and Sewell had "clearly committed the tort of duress." Memorandum and Order at 16.
 
 
 14
 Turning to the question of damages, the court found that the McBrides, "although traumatized by the destruction of the chicken raising business by factors beyond their control, were further and severely traumatized by the misconduct of Taylor and Sewell." Memorandum and Order at 16-17. The court then proceeded to award damages of $131,143.04 (plus interest) based on the "unjustified failure to forgive the balance of the debt upon the McBrides' offer to convey." Memorandum and Order at 17. An additional $50,000.00 was awarded for the McBrides' "extended emotional distress, inconvenience, and embarrassment," Memorandum and Order at 17, along with attorney fees and costs in an amount yet to be determined.
 
 
 15
 On appeal to this Court the government's main points, buttressed by various supporting arguments, are: (1) the District Court exceeded its jurisdiction when it considered the McBrides' contract and tort claims, as these claims were not based on the injunction, which was the predicate for the McBrides' contempt motion; (2) even if Taylor and Sewell violated the injunction the McBrides are not entitled to any relief; and (3) the District Court erred in entering its finding of contempt.[5]
 
 II.
 
 16
 We first address the issue of whether the District Court erred in finding that the actions of Taylor and Sewell[6] were contumacious of the Coleman v. Block injunction. The nationwide preliminary injunction in Coleman v. Block issued on November 14, 1983. We quote the relevant language thereof:
 
 
 17
 3. That the defendants, their agents, subordinates, and employees, are enjoined until further order of this court from
 
 
 18
 . . . . .
 
 
 19
 (c) Demanding voluntary conveyance by the plaintiffs, or
 
 
 20
 (d) Repossessing chattels of the plaintiffs or in any way proceeding against or depriving the plaintiffs of property in which the defendants have a security interest,
 
 
 21
 until defendants shall have given any plaintiffs against whom the defendants propose to proceed at least 30 days notice [of the FmHA loan deferral program].
 
 
 22
 Coleman v. Block, 580 F.Supp. at 193-94.[7] The District Court found that Taylor and Sewell violated the injunction by failing to give the McBrides adequate and meaningful notice of their rights before depriving them of property in which the FmHA had only a security, not a possessory, interest, and before demanding from them voluntary conveyance. Memorandum and Order at 13. Because we conclude that these findings are not clearly erroneous, see Fed.R.Civ.P. 52(a), the District Court's contempt citation was not an abuse of discretion. See Hartman v. Lyng, 884 F.2d 1103, 1106 (8th Cir.1989) (reviewing a contempt holding by an abuse of discretion standard); see also Davis v. Bowen, 894 F.2d 271, 272 (8th Cir.1989) ("Our review of the denial of a contempt motion is limited to determining whether the district court abused its discretion."), cert. denied, 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990).
 
 
 23
 On February 16, 1984, the McBrides met with Taylor. Taylor informed the McBrides at that meeting that they could either convey the farm to the FmHA and get a release of their debt or be foreclosed and owe any unliquidated balance. As Taylor gave the McBrides these "limited options of selling [their] land or facing foreclosure," Hartman, 884 F.2d at 1105, we would agree that his actions "constituted a demand [for voluntary conveyance]." Hartman, 884 F.2d at 1105. Although the record shows that the parties also discussed the possibility of refinancing based upon the McBrides' dealings with Dorothy Egg Farms, there is some dispute as to the precise language used, and we cannot say the District Court was clearly erroneous in finding that such refinancing was never a real possibility.
 
 
 24
 Based upon this record, the District Court did not commit clear error in finding that Taylor and Sewell failed to comply with the notice provisions of the Coleman injunction and thus failed to give the McBrides adequate notice of their rights. The contempt finding therefore was factually supported and was not an abuse of discretion.
 
 III.
 
 25
 Although the District Court's contempt finding was not an abuse of discretion, we cannot sustain the court's award of damages. The government argues strenuously that sovereign immunity precludes an award against the government of compensatory damages, indistinguishable from those that might be awarded in a contract or tort action, in a civil contempt proceeding. This is a weighty argument, and we regard it very seriously. It does strike us as being a dubious proposition that by filing a contempt motion a claimant can be positioned to recover an unlimited amount of compensatory damages from the United States without being bound by the strictures of either the Tucker Act or the Federal Tort Claims Act, which are express (but carefully limited) waivers by the United States of its sovereign immunity with respect to contract and tort claims. Absent an express waiver of sovereign immunity, money awards cannot be imposed against the United States. See United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); Block v. North Dakota, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983). See also Barry v. Bowen, 884 F.2d 442, 443-44 (9th Cir.1989) (holding that district court's award of monetary sanctions for contempt violated the sovereign immunity of the United States, but also reversing on other grounds). There does not appear to be any express waiver of sovereign immunity applicable to this case.[8] We therefore have grave doubts that the contempt power can be carried as far as it has been carried against the United States in the present litigation.
 
 
 26
 We need not decide that question, however, for as is apparent from the language of the District Court's opinion, the damages that it awarded did not flow from the defendants' violation of the notice provision of the Coleman injunction. Instead, as the government contends, the damages the court awarded flow from conduct that antedated the Coleman injunction or that otherwise is not encompassed by that injunction. This is crystal clear from the court's statement that it was awarding the McBrides damages of $131,143.04 resulting from the defendants' "unjustified failure to forgive the balance of the debt upon the McBrides' offer to convey...." Memorandum and Order at 17. This statement posits the existence of a duty to forgive the balance of the McBrides' debt--a duty that is nowhere to be found in the Coleman injunction and that could only arise from conduct or undertakings not covered by that injunction. Indeed, in reviewing the record we are struck by the McBrides' total failure to show a causal connection between the defendants' failure to give timely notice as required by the injunction and the damages alleged. As a factual matter, they have not shown that the course of events would have played out any differently had the required notice been given in a timely manner. For example, the McBrides have made no factual showing that if the required notice had been given in a timely manner they would have applied for the loan deferral program, nor have they made even an attempt to show that if they had applied for the program they would have qualified for it and received a loan deferral.
 
 
 27
 The District Court understandably and properly was troubled by what it found to be misconduct by Taylor and Sewell in their course of dealing with the McBrides. In a related action by the McBrides against Taylor and Sewell another court has called the defendants' conduct "deceitful," a characterization with which we have no quarrel. See McBride v. Taylor, 924 F.2d 386, 387 (1st Cir.1991) (rejecting the McBrides' Bivens-type claims, based on the same facts as the present case, on the ground that Taylor and Sewell had not violated any clearly established constitutional right and thus were entitled to qualified immunity). Although it is quite tempting to use the defendants' violation of the Coleman injunction as a reason for compensating injuries that actually flow from other wrongs, "judicial discretion must not yield to such impulses." Barry, 884 F.2d at 444. As the McBrides have failed to show that their losses were caused by the defendants' failure to give the notice required by the Coleman injunction--rather than by other circumstances and conduct that do not implicate the Coleman injunction, and therefore cannot be a basis for relief in this contempt action--the award of damages is clear error and is not sustainable. See Hartman, 884 F.2d at 1106 ("The district court's finding with respect to damages is reversible only if clear error.").
 
 
 28
 A special word is in order regarding the award of $50,000.00 for emotional distress. Even assuming arguendo a causal relationship between the violation of the injunction and the harm suffered, we do not believe civil contempt to be an appropriate vehicle for awarding damages for emotional distress, see In re Walters, 868 F.2d 665, 670 (4th Cir.1989). But see Powell v. Ward, 487 F.Supp. 917 (S.D.N.Y.1980), aff'd as modified, 643 F.2d 924 (2nd Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). The problems of proof, assessment, and appropriate compensation attendant to awarding damages for emotional distress are troublesome enough in the ordinary tort case, and should not be imported into civil contempt proceedings. Although in some circumstances an award of damages to a party injured by the violation of an injunction may be appropriate, see, e.g., Welch v. Spangler, 939 F.2d 570, 572-73 (8th Cir.1991); In re Tetracycline Cases, 927 F.2d 411, 413 (8th Cir.1991), the contempt power is not to be used as a comprehensive device for redressing private injuries, and it does not encompass redress for injuries of this sort.
 
 
 29
 Our disposition of the damages issue makes it unnecessary for us to address the government's other arguments. In conclusion, the District Court's finding that a contempt occurred is affirmed, but the award of damages is reversed. The case is remanded to the District Court for further consideration of the issue of attorney fees and costs.
 
 
 30
 LAY, Chief Judge, concurring and dissenting.
 
 
 31
 I fully concur that the government was in contempt of the Coleman v. Block injunction, 580 F.Supp. 192 (D.N.D.1983) (temporary injunction), 580 F.Supp. 194 (D.N.D.1984) (permanent injunction), as set forth by the district judge. I also agree that the government is not liable for money damages for emotional distress or for breach of contract.[1]
 
 
 32
 However, I respectfully disagree with the majority opinion in its denial of reparations to the McBrides in the amount of $131,143.04. This amount represents the deficiency owed by the McBrides to the FmHA as a direct result of the government's contumacious conduct in violation of the district court's injunction. I would also hold that the government may not set up the defense of sovereign immunity to avoid payment of such a compensatory sanction.
 
 Reparations
 
 33
 In order to fully appreciate the government's role in causing the deficiency foreclosure and loss of the McBrides' farm it is necessary to understand the vindictive and punitive conduct of the government officials.[2]
 
 
 34
 The McBrides obtained an FmHA loan and began poultry farming in 1975. They farmed with apparent success for six years until a general collapse of the Maine poultry industry caused them to default on their loans. The court found that although the McBrides had a cooperative relationship with their private banker, they had difficulty working with Steve Taylor, the FmHA county supervisor. The district court, which had the opportunity to observe the witnesses, attributed these difficulties to Taylor's attitude. The court noted that two other farmers had registered complaints about Taylor, including one who stated that Taylor had vowed to "kick [the farmer's] ass off the farm." McBride v. Lyng, No. A1-834709, slip op. at 6 (D.N.D. Jan. 4, 1989).
 
 
 35
 Aside from Taylor's arrogant attitude, the district court found that Taylor encouraged the McBrides to allow foreclosure of their farm, promising that the FmHA would purchase the mortgage and work something out with them. Relying on Taylor's promise, the McBrides allowed the foreclosure proceedings to run their course, even though they could have paid off the bank mortgage by virtue of funds available from Mrs. McBride's mother. In allowing the foreclosure to take place, the McBrides incurred expenses of approximately $10,000 in costs of foreclosure and interest, expenses they could have avoided by paying off their loan. McBride v. Lyng, slip op. at 14.
 
 
 36
 Despite his assurances to the McBrides, Taylor had the FmHA purchase the mortgage with the intent to force the McBrides off their farm.[3] Sometime around February 18, 1984, Taylor informed the McBrides they must either convey their entire farm in exchange for a full release from FmHA, or face foreclosure and the liability for any deficiency not satisfied by the proceeds of the foreclosure sale. Taylor did not give the McBrides meaningful and adequate notice of their rights, including their right to establish eligibility for the loan deferral program, as required by the Coleman v. Block temporary injunction filed November 14, 1983, and the permanent injunction filed February 17, 1984.
 
 
 37
 Although the McBrides signed voluntary conveyance papers on February 21, 1984, the FmHA rejected the conveyance several days later. Without the McBrides' knowledge, the FmHA had modified the conveyance papers to add the requirement of immediately marketable title, and the FmHA's counsel determined that the McBrides could not convey marketable title because the pending auction sale presented the possibility of a third-party claim in reliance on the advertised auction.[4] This sequence of events, engineered by Taylor, prevented the McBrides from satisfying the bank mortgage to clear title on the farm.
 
 
 38
 Thus, through manipulation and bad faith Taylor made sure that the McBrides were left with nothing. If the McBrides had not relied on Taylor's promises, they would have been able to preserve some portion of their home and farm. If they had been given an opportunity to clear their title, the McBrides could have conveyed the property and avoided the deficiency. More importantly, if Taylor had given the McBrides notice of the loan deferral program, they could have kept their farm and avoided any deficiency.
 
 
 39
 There can be little question that if the McBrides had been informed of the loan deferral program, qualified for the program, and received a loan deferral, they would not have been subject to the $131,143.04 deficiency. The majority speculates that the McBrides might not have applied or qualified for the loan deferral program. This assumption ignores evidence that the McBrides had access to funds they could have used to satisfy the bank mortgage if the FmHA would have deferred payment on the FmHA loans. Moreover, at the time the McBrides' farm was sold at auction, the Maine poultry industry had recovered to the extent that the McBrides had a contract with a poultry processor and were operating at fifty percent capacity. There is every reason to believe the McBrides would have been able to easily pay future loan payments to the FmHA. Furthermore, because the FmHA prevented the McBrides from having the opportunity to be considered for loan deferral, it should not be permitted to argue that the McBrides might not have applied or qualified for deferral.
 
 
 40
 I therefore must respectfully disagree with the majority's conclusion that the monies ordered restored to the McBrides in the amount of $131,143.04 did not flow directly from the government's violation of the Coleman v. Block injunction. The overwhelming weight of the evidence clearly supports the district court's specific finding to the contrary:
 
 
 41
 [The] unjustified failure to forgive the balance of the debt upon the McBrides' offer to convey, with the capacity to convey on the terms demanded by Sewell and Taylor, result[ed] in damages of $131,143.04 plus any interest that may have accrued from October 27, 1988 to the date of settlement by FmHA....
 
 
 42
 McBride v. Lyng, slip op. at 17.
 
 
 43
 A district court is provided broad discretion in fashioning an appropriate remedy for contempt. See Hartman v. Lyng, 884 F.2d 1103, 1106 (8th Cir.1989). "[A] compensatory sanction is not imposed to vindicate the court's authority or to punish the contemnor, but rather serves to make reparation to the injured party, restoring that party to the position it would have held had the court's order been obeyed." In re Grand Jury Subpoena of June 12, 1986, 690 F.Supp. 1451, 1453 (D.Md.1988); see also Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978) ("Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance."); United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 41 (1st Cir.1980) ("It is well settled ... that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender.") (quoting Parker v. United States, 126 F.2d 370, 380 (1st Cir.1942)); Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1344 (3d Cir.1976) ("Remedial or compensatory [contempt] actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience.").
 
 
 44
 We should not reverse the exercise of the district court's broad discretion in this area unless there has been a showing of clear abuse. As the Supreme Court has stated: "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949); see also Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir.1979) (the party injured due to the violation of a court order by another is entitled to "be made whole for the harm he has suffered.").[5] By denying them full remedial relief, the majority does a great injustice to the McBrides and condones the reprehensible actions of the FmHA.
 
 Sovereign Immunity
 
 45
 I now turn to the question of whether, in a contempt proceeding, the sovereign immunity of the United States precludes the imposition of compensatory sanctions to a party injured as a result of government conduct violative of a court order.
 
 
 46
 Although disclaiming its need to decide this issue, the majority nevertheless sends a clear signal that it would uphold the government's defense of sovereign immunity. The cases cited on page 10 of its opinion, however, do not squarely address the issue here. The court in Barry v. Bowen, 884 F.2d 442, 443-44 (9th Cir.1989), merely expressed doubt about its ability to assess damages against the government in a contempt proceeding.
 
 
 47
 I respectfully submit that the majority has overlooked provisions of the Administrative Procedure Act (APA) which expressly waive sovereign immunity in actions other than those seeking money damages. 5 U.S.C. § 702 (1988).[6] Section 702 provides in relevant part:
 
 
 48
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.
 
 
 49
 5 U.S.C. § 702.
 
 
 50
 Under section 702 of the APA, the federal courts maintain broad equitable power to remedy the actions of the United States government which adversely affect private citizens. The APA was specifically amended by Congress in 1976 to "strengthen [the] accountability [of the government] by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages...." H.R.Rep. No. 1656, 94th Cong., 2d Sess. 4, reprinted in 1976 U.S.C.C.A.N. 6121, 6124. The House Judiciary Committee reasoned that just as the United States is treated the same as other landowners in actions to quiet title, "so too has the time now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." Id. at 9, 1976 U.S.C.C.A.N. at 6129. The House Report goes on to declare that "[o]nly if citizens are provided with access to judicial remedies against Government officials and agencies will we realize a government truly under the law." Id. at 10, 1976 U.S.C.C.A.N. at 6130.
 
 
 51
 In Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), the Supreme Court interpreted section 702 to permit equitable suits for specific relief in the form of money. See also Maryland Dep't of Human Resources v. Department of Health & Human Servs., 763 F.2d 1441 (D.C.Cir.1985); cf. School Comm. v. Department of Educ., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (order requiring reimbursement by town to parents for educational costs not an award of money damages). The Court distinguished money damages from monetary relief, stating that "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' ... [S]pecific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' " Bowen, 487 U.S. at 893, 895, 108 S.Ct. at 2731, 2733 (quoting D. Dobbs, Handbook on the Law of Remedies 135 (1973)).
 
 
 52
 There is no question "that the 1976 amendment to section 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment...." See Bowen, 487 U.S. at 891-92, 108 S.Ct. at 2730-31. In the present case, the plaintiffs claim they have suffered a legal wrong because of agency action, and that they have been adversely affected and aggrieved by the agency action within the meaning of the relevant statute. The district court's finding of the defendant in contempt of court by reason of the injunction previously issued is a part and parcel of the original suit against the agency. See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 445, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911) (civil contempt proceedings are "tried as a part of the main cause."); Panther Pumps & Equipment Co. v. Hydrocraft, Inc., 566 F.2d 8, 17 n. 6 (1977). I respectfully submit that section 702 is applicable under these circumstances.
 
 
 53
 Aside from the express waiver I find in section 702, I would alternatively hold that the doctrine of sovereign immunity cannot be used as a defense against the district court's compensatory sanction against the secretary in order to make the plaintiffs whole because "courts have inherent power to enforce compliance with their lawful orders through civil contempt." Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990) (quoting Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966)); see also United States v. Trudell, 563 F.2d 889, 891 (8th Cir.1977) ("It is widely recognized that a court has inherent authority to punish contemptuous behavior that obstructs the judicial process.").
 
 
 54
 Without question, the power of the judiciary to compel compliance with its orders extends to the executive branch. The Seventh Circuit, awarding costs and attorney fees to an injured party after finding the federal government in contempt, stated that "[t]he executive branch of government has no right to treat with impunity the valid orders of the judicial branch." Nelson v. Steiner, 279 F.2d 944, 948 (7th Cir.1960). In Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), the Supreme Court affirmed the inherent authority of the federal courts to initiate criminal contempt proceedings against an officer of the United States, acting in his official capacity. The Court observed that the federal courts' power to initiate contempt proceedings is grounded on necessity: "The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches." Id. 481 U.S. at 796, 107 S.Ct. at 2131. The Court further stated that "[i]f the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that Branch declined prosecution." Id. 481 U.S. at 801, 107 S.Ct. at 2134.
 
 
 55
 If sovereign immunity can bar compensatory sanctions for contempt against the United States, the judiciary becomes completely dependent on the good graces of the executive branch for compliance with its orders. At least one circuit has rejected this position with respect to state sovereign immunity. Reasoning that "[t]he court's power to order [remedial] contempt fines ... is ancillary to its power to order compliance with the law," the First Circuit rejected the State of Massachusetts' assertion of sovereign immunity against the imposition of compensatory sanctions to injured parties after finding the state in contempt. Fortin v. Commissioner of Mass. Dep't of Pub. Welfare, 692 F.2d 790, 797-98 (1st Cir.1982). While there is concededly a fundamental difference in the grant of sovereign immunity to the states under the eleventh amendment and the immunity from damages afforded the federal government,[7] one legal commentator has concluded that "in substance [federal sovereign immunity doctrine] has developed as an almost exact counterpart of eleventh amendment-state sovereign immunity doctrines. In fact, the theory behind the doctrines of state and federal sovereign immunity is sufficiently similar that the reasoning of cases discussing federal sovereign immunity almost always carries over to eleventh amendment cases ... and vice versa." Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 U.Pa.L.Rev. 515, 517-18 (1978) (footnote omitted).
 
 
 56
 The Supreme Court has recognized that "[i]f a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978). The alternative struck the Court as much more intrusive upon sovereign rights: "The principles of federalism that inform the Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail." Id. This argument applies with equal force to the government's claim of sovereign immunity here.[8]
 
 
 57
 It would seriously erode our system of separation of powers if the executive branch was effectively immune from the judicial power. The federal courts must have the inherent authority to enforce executive branch compliance with judicial orders which serve to restore to the status quo a party injured as a direct result of the government's contumacious conduct. Otherwise, the judiciary would be powerless to impose the most effective remedy for ensuring compliance with its orders against the most frequent litigant in the federal courts.
 
 
 58
 This case involves a fundamental question relating to the inherent power of the federal judiciary as a co-equal branch of government. The power to use money sanctions as a means of reparation rests upon the fundamental premise that "[w]hat the chancellor may order, he may enforce...." Hirschhorn, Where the Money Is: Remedies to Finance Compliance with Structural Injunctions, 82 Mich.L.Rev. 1815, 1861 (1984); see also D. Dobbs, Handbook on the Law of Remedies 93.
 
 
 59
 I would vacate the award of the district court for $50,000 damages arising from emotional injury. I would affirm the monetary sanction in the sum of $131,143.04 against the United States. Since the majority disagrees, I must respectfully dissent.
 
 
 
 *
 The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed
 
 
 [1]
 The factual and procedural history of the Coleman litigation is set forth in Coleman v. Lyng, 864 F.2d 604 (8th Cir.1988), cert. denied, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 351 (1989)
 
 
 [2]
 The FmHA also obtained the only security interest in the equipment purchased with the operating loan
 
 
 [3]
 The McBrides signed a conveyance document and deed to effectuate the real estate transfer and a bill of sale to convey the equipment
 
 
 [4]
 The District Court dismissed the charges against the Department of Agriculture and the other defendants
 
 
 [5]
 In its brief and also in a post-argument submission filed November 18, 1991, the government suggests that because the Coleman litigation has ended and the Coleman injunction has been vacated, see Coleman, 864 F.2d at 612, this case is moot and the contempt finding should be vacated. We disagree. Although our opinion in Coleman ordering the injunction vacated was announced on December 28, 1988 and the contempt finding in the present case was filed a week later, on January 4, 1989, the petition for rehearing in Coleman was not denied until February 1, 1989, and our mandate did not issue until after that had occurred. The District Court thereafter, in keeping with our mandate, dismissed the Coleman case. See Coleman, Civil No. A1-83-47 (D.N.D. Feb. 21, 1989). Thus the injunction was still in place when the District Court entered the contempt finding, and the contumacious conduct occurred during the time the injunction was in force. In these circumstances, we do not believe the present case is moot. If the injunction no longer had been in force when the District Court entered its contempt finding, a different case would be presented, and we express no opinion as to the jurisdictional question in such a case
 
 
 [6]
 The litigants have not suggested any distinctions among the three parties the District Court found in contempt. Although it is not clear that the Secretary of Agriculture can be held in contempt on a theory of respondeat superior, " '[q]uestions not raised, briefed or argued will ordinarily be given no consideration by an appellate court.' " Jasperson v. Purolator Courier Corp., 765 F.2d 736, 741 (8th Cir.1985) (citations omitted)
 
 
 [7]
 Nearly identical language appears in the permanent injunction issued February 17, 1984. Coleman v. Block, 580 F.Supp. at 211
 
 
 [8]
 We note that the Agricultural Credit Act of 1987, Pub.L. No. 100-233, 101 Stat. 1568 (1987), the enactment of which mooted the Coleman litigation, see Coleman, 864 F.2d at 612, does not even provide an implied private right of action for farmer-borrowers, see Zajac v. Federal Land Bank of St. Paul, 909 F.2d 1181, 1183 (8th Cir.1990), much less any sort of express waiver of the sovereign immunity of the United States
 
 
 [1]
 In their motion to hold the government in contempt the McBrides asked for pecuniary relief which would restore them to their status quo. Motion by Patrick McBride and Sonya McBride to Find Contempt at 4. They did not seek damages for breach of contract or any tort committed by the government. As noted below, the McBrides did seek these damages in a separate law suit not involved or related to the contempt motion filed in the district court
 
 
 [2]
 The First Circuit called the conduct of the government officials in this case "deceitful." See McBride v. Taylor, 924 F.2d 386, 387 (1st Cir.1991)
 
 
 [3]
 Taylor told a friend of the McBrides that McBride would be "off his farm and on the street in 30 days." McBride v. Lyng, slip op. at 8
 
 
 [4]
 Two days after it rejected the voluntary conveyance the FmHA did receive marketable title when it purchased the McBrides' farm at the auction
 
 
 [5]
 In Manhattan Industries v. Sweater Bee By Banff, Ltd., 885 F.2d 1 (2d Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990), the Second Circuit did not even require actual losses to be shown, but rather utilized the unjust enrichment theory of compensation. The court cited Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 455-56, 52 S.Ct. 238, 241-42, 76 L.Ed. 389 (1932), for the proposition that "a civil contempt fine is not always dependent on a demonstration of 'actual pecuniary loss.' " 885 F.2d at 5. Relying upon Leman, the court held that compensatory relief may include "profits derived from the contemnor from violation of a court order. Such profits are 'an equivalent or a substitute for legal damages,' when damages have not been shown, and are recoverable 'not by way of punishment but to insure full compensation to the party injured.' " Id. at 6 (quoting Leman, 284 U.S. at 456, 52 S.Ct. at 241) (citations omitted); see also Broadview Chem. Corp. v. Loctite Corp., 311 F.Supp. 447 (D.Conn.1970)
 
 
 [6]
 The government does not dispute the applicability of section 702 but urges that because monetary relief is sought here, it does not fall within the express waiver of section 702. Brief for Appellant at 27. I disagree. As will be discussed, infra, the Supreme Court has recognized the difference between money damages and the equitable restoration of monies. See Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). Where the action is for equitable relief and the restoration of monies expended, the express waiver in section 702 applies. In the present case, the plaintiffs received reparations from the district court in the form of monies paid or obligated under the deficiency judgment by reason of the secretary's violation of the Coleman v. Block injunction
 
 
 [7]
 The debates over the eleventh amendment and the question of to what extent sovereignty was yielded to the federal government place perhaps a different shade on whether a state government might be liable for reparations in federal court in a contempt proceeding
 
 
 [8]
 In recent decisions dealing with the government's sovereign immunity against monetary sanctions imposed under various rules of civil and appellate procedure, several circuit courts have condoned awards of attorney fees and costs against the federal government despite the absence of express waivers
 The Tenth Circuit rejected the government's sovereign immunity claim with respect to Rule 11 sanctions under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1988). Adamson v. Bowen, 855 F.2d 668 (10th Cir.1988). The court found its holding consistent with the legislative history of that act, which "reflects the belief that, at a minimum, the United States should be held to the same standards in litigating as private parties." 855 F.2d at 672 (quoting H.R.Rep. No. 1418, 96th Cong., 2d Sess. 19, reprinted in 1980 U.S.C.C.A.N. 4984, 4998).
 In Mattingly v. United States, 939 F.2d 816 (9th Cir.1991), the Ninth Circuit also affirmed the imposition of Rule 11 sanctions against the United States over sovereign immunity objections. Cf. Schanen v. United States Dep't of Justice, 798 F.2d 348, 350 (9th Cir.1986) (awarding a fugitive from justice and her lawyer attorney fees and costs related to the government's failure to defend diligently a FOIA action: "Since it was the government's lack of diligence that prolonged these proceedings, justice demands that Schanen and Tillet be compensated for their expenses occasioned by the additional proceedings."). Although the Ninth Circuit had previously permitted a private party to recover attorney fees from the United States under Rule 11, United States v. Gavilan Joint Community College Dist., 849 F.2d 1246 (9th Cir.1988), Mattingly upheld a $1,000 fine to be paid to the district court. The Ninth Circuit explicitly rejected the Equal Access to Justice Act theory relied upon by the Tenth Circuit, grounding its opinion instead on the Federal Rules of Civil Procedure, which "apply by their own force to all litigants before the court." 939 F.2d at 818. Because Congress authorized the promulgation of those rules, the Ninth Circuit reasoned, their application to the United States as a litigant cannot violate sovereign immunity. Id.; see also Joseph v. United States, 121 F.R.D. 406, 414 (D.Haw.1988).
 Similarly, the Ninth Circuit has upheld compensatory sanctions against the United States under Federal Rule of Civil Procedure 37(b), see United States v. National Medical Enters., 792 F.2d 906 (9th Cir.1986); United States v. Sumitomo Marine & Fire Ins. Co., 617 F.2d 1365, 1371 (9th Cir.1980) (sanctions imposed against government attorney to deter "further disobedience of court orders.") (Rule 37(f) then prohibited the assessment of fees or costs against the United States itself), and the First Circuit has affirmed an award against United States under Federal Rule of Appellate Procedure 38, see In re Good Hope Indus., 886 F.2d 480 (1st Cir.1989).