UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2041

UNITED STATES OF AMERICA,

Appellant,

v.

RICHARD A. HORN, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

Ellen R. Meltzer, Special Counsel, Fraud Section, U.S. Dep't

of Justice, with whom Peter E. Papps, United States Attorney, and

Alexander Weir III, Trial Attorney, U.S. Dep't of Justice, were
on brief, for the United States.
Christopher R. Goddu and Peter G. Callaghan, with whom James

M. Costello, Robert E. McDaniel, Devine, Millimet & Branch P.A.,

Steven M. Gordon, Shaheen, Cappiello, Stein & Gordon, William E.

Brennan, Timothy I. Robinson, and Brennan, Caron, Lenehan &

Iacopino were on consolidated brief, for appellees.

July 25, 1994

SELYA, Circuit Judge. We decide today a question of
SELYA, Circuit Judge.

first impression: Do principles of sovereign immunity bar a

federal district court, exercising its supervisory power, from

assessing attorneys' fees and costs against the federal

government in a criminal case? We answer this question

affirmatively and, therefore, annul the district court's fee-

shifting orders.

I. FACTUAL BACKGROUND

This appeal arises out of unpardonable misconduct

committed by a federal prosecutor who should have known better.

The factual background of the criminal case in which the

misconduct occurred a multi-defendant prosecution for, inter

alia, conspiracy to defraud a federally insured financial

institution is memorialized in a recent opinion of this court.

See United States v. Lacroix, F.3d , (1st Cir. 1994)

[No. 93-1845, slip op. at 2-4]. The facts pertaining to the

misconduct are recounted in the opinion below. See United States

v. Horn, 811 F. Supp. 739, 741-44, 748-51 (D.N.H. 1992). For

purposes of deciding the abstract question of law that confronts

us today, we largely omit the former set of facts, and limn the

latter in less than exegetic detail.

In mid-1992, a federal grand jury returned a 102-count

indictment against seven individuals allegedly involved in a

conspiracy to market and sell newly constructed homes by

fraudulent means. The indictment charged violations of 18 U.S.C.

2371, 1014 and 1344. The prosecutors who controlled the case

2

were members of the Justice Department's "New England Bank Fraud

Task Force," so called. The defendants, none of whom were

indigent, obtained counsel at their own expense.

During pretrial proceedings, the government made more

than 10,000 documents available for inspection at the Boston

office of Aspen Systems, an independent document management firm

retained by the Task Force. On November 9, 1992, an attorney

representing defendants Matthew Zsofka, John Lee, and Evangelist

Lacroix visited the document repository to search for papers that

might prove helpful in cross-examination. A government paralegal

volunteered to have a member of Aspen's clerical staff photocopy

any document that caught the lawyer's eye. The attorney accepted

the offer. When the paralegal mentioned this undertaking to the

lead prosecutor, she was instructed to have the Aspen employee

make an extra copy of each defense-selected document for the

government's edification. Defense counsel was not informed of

this added flourish.

To paraphrase the Scottish poet, the best-laid schemes

of mice and prosecutors often go awry. Cf. Robert Burns, To a

Mouse (1785). When the photocopying of desired documents took

longer than seemed reasonable, the defense attorney smelled a

rat. A cursory investigation uncovered the prosecution's

experiment in duplicitous duplication. The lawyer promptly

demanded that the government return its copies of the papers

culled by the defense. When his demand fell on deaf ears, he

immediately drafted a motion to seal, filed the motion with the

3

district court, and servedit before theclose of business thatday.

At this delicate juncture, the lead prosecutor poured

kerosene on a raging fire.1 She did not passively await the

court's ruling on the motion, but, instead, during the three days

that elapsed before the district court took up the motion, the

prosecutor reviewed the surreptitiously duplicated documents,

discussed them with two of her subalterns, and used them to

prepare a key prosecution witness (in the presence of a second

possible witness). Thus, by November 13, 1992, when the court

granted the motion to seal and explicitly instructed the lead

prosecutor not to make further use of the papers singled out by

the defense or take further advantage of the situation,

appreciable damage already had been done.

The lead prosecutor then made a bad situation worse.

Two pages mysteriously disappeared from the lead prosecutor's

cache of ill-gotten documents before the set was submitted to the

district court for sealing. And in direct defiance of the

court's order, the lead prosecutor prepared a complete new set

for her own use. Adding insult to injury, she next signed an

affidavit of somewhat questionable veracity. Finally, when she

appeared before the district court to discuss the bizarre game

1The district court made a deliberate decision to spare the
lead prosecutor public humiliation and revised its order before
publication to delete any mention of the prosecutor's name.
Although we, if writing on a pristine page, might not be so
solicitous, we honor the district court's exercise of its
discretion, mindful that its choice has substantive implications.
Cf. United States v. Hasting, 461 U.S. 499, 506 n.5 (1983)

(listing public chastisement of errant attorney as a permissible
form of sanction for misconduct).

4

she had been playing, she made a series of inconsistent

statements evincing what the court charitably called a "lack of

candor." Horn, 811 F. Supp. at 749, 750 n.4.

From the outset, defendants Zsofka, Lee, and Lacroix

had mounted a cooperative defense. Thus, the three of them were

equally vulnerable to the misconduct that occurred. Not

surprisingly, the trio moved to dismiss the case on the ground of

prosecutorial misconduct.2 The government objected. In

evaluating the motions, the lower court ruled that the current

selection during the discovery phase of a pending case offers

insight into counsel's thoughts, and, therefore, constitutes

privileged work product. See id. at 745-47 (citing In re San

Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007 (1st Cir.

1988)). After rejecting the government's argument that the

privilege had been waived, the court determined that the lead

prosecutor, by furtively copying and thereafter reviewing the

selected documents, crossed the ethical line. The court further

ruled that this prosecutorial misconduct not only violated the

defendants' work-product privilege, but also abridged their Fifth

Amendment right to due process and their Sixth Amendment right to

2For ease in reference, we call Zsofka, Lee, and Lacroix
"the appellees." Withal, we note that the district court
permitted three other defendants Richard Horn, Patrick Dion,
and Patricia Dion to join in the request for dismissal. See

Horn, 811 F. Supp. at 744-45. Though they had no connection to

the duped attorney, these three defendants ultimately received
modest fee awards. Notwithstanding, their monetary interest in
this appeal, they eschewed the filing of appellate briefs.
Consequently, we make no further reference to them or to a
seventh defendant, Susan Yildiz, who entered into a plea
agreement before the misconduct occurred.

5

effective assistance of counsel. See id. at 747-52.

Finding prejudice, but not a stain so indelible as to

justify dismissing the indictment, see id. at 751, the court

stitched together a serviceable fabric of narrowly tailored

remedies, see id. at 751-52. The court ordered the government to

provide the defense with summaries of its witnesses' testimony

and lists of its exhibits; permit the defense to depose the two

potential witnesses who had been exposed to the bootleg

documents; refrain from referring at trial to the substance of

the documents except in response to defense references; and

remove the lead prosecutor from the case. See id. at 752.

Additionally, the court referred the lead prosecutor to the

disciplinary committees of her two bar associations, and, in the

portion of its order that sparked the current controversy, the

court directed the government to pay the fees and costs incurred

by the defendants in litigating the misconduct issue. See id.

Although the court's original order was inexplicit concerning the

source of its authority to assess fees and costs, the court, in

denying the government's motion to reconsider, explained that it

grounded this sanction in the judiciary's supervisory power. See

id. at 753-54.

Zsofka, Lee, and Lacroix stood trial early in 1993.

They were each convicted on at least one count, and were

sentenced in July.3 On August 18, 1993, the district court

3The other four defendants pled guilty at various times.
They were all sentenced in May of 1993.

6

quantified its earlier order, assessing a grand total of

$46,477.80 in fees and costs. The other sanctions have been

carried out and the defense no longer presses the claim that the

district court should have dismissed the indictment. Hence, all

that remains of the case is the government's appeal from the

assessment of fees.

The government contests the award chiefly on the ground

that it is prohibited by principles of sovereign immunity.4

Extracted from its complicated factual predicate, drained of

rancor, and separated from other, essentially extraneous

disputes, this appeal requires us to serve as the dispatcher at a

crossing where two powerful engines the judiciary's supervisory

power and the government's sovereign immunity are on a

collision course.

II. DOCTRINAL BACKGROUND

In ascertaining what happens when doctrines clash,

derivation frequently becomes important. Thus, we turn to this

task.

A. Supervisory Power.

Supervisory power, sometimes known as inherent power,

encompasses those powers which, though "not specifically required

by the Constitution or the Congress," United States v. Hasting,

4The government also maintains that it could not have
violated any applicable work-product privilege, and cannot be
penalized for so doing, because the defense waived any such
privilege by making voluntary disclosures to a government agent,
namely, the Aspen office worker. Because we agree that the
government is shielded from the monetary award by principles of
sovereign immunity, we take no view of this asseveration.

7

461 U.S. 499, 505 (1983), are nonetheless "necessary to the

exercise of all others," Roadway Express, Inc. v. Piper, 447 U.S.

752, 764 (1980) (quoting United States v. Hudson, 11 U.S. (7

Cranch) 32, 34 (1812)). See generally United States v. Santana,

6 F.3d 1, 9-10 (1st Cir. 1993).

Although the doctrine's ancestry can be traced to the

early days of the Republic, see, e.g., Hudson, 11 U.S. at 34; see

also Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510 (1873)

(observing that the "moment the courts of the United States were

called into existence . . . they became possessed of [inherent]

power"), a full-scale genealogical dig would serve no useful

purpose. It suffices to say that the doctrine emerged in modern

form roughly a half-century ago, see McNabb v. United States, 318

U.S. 332, 341 (1943), and it has since developed most robustly in

the area of criminal procedure, see Sara Sun Beale, Reconsidering

Supervisory Power in Criminal Cases, 84 Colum. L. Rev. 1433,

1435-64 (1984). While supervisory power is sometimes understood

to derive from the Constitution, either as incidental to the

Article III grant of judicial power, see id. at 1464-83, or as

implicit in the separation of powers, see Eash v. Riggins

Trucking, Inc., 757 F.2d 557, 562 (3d Cir. 1985), the Court has

made it clear that, at least as a general proposition, Congress

may limit the power of lower federal courts by rule or statute,

see Chambers v. NASCO, Inc., 501 U.S. 32, 47 (1991).5

5It is not yet settled whether some residuum of the courts'
supervisory power is so integral to the judicial function that it
may not be regulated by Congress (or, alternatively, may only be

8

In what is not necessarily an exhaustive listing, the

Court has recognized three purposes to which the supervisory

power may be dedicated: "to implement a remedy for violation of

recognized rights, to preserve judicial integrity . . . and . . .

as a remedy designed to deter illegal conduct." Hasting, 461

U.S. at 505 (internal citations omitted). Invoking this third

theme, we have warned that we will consider unleashing the

supervisory power in criminal cases "[w]hen confronted with

extreme misconduct and prejudice," in order "to secure

enforcement of `better prosecutorial practice and reprimand of

those who fail to observe it.'" United States v. Osorio, 929

F.2d 753, 763 (1st Cir. 1991) (quoting United States v. Pacheco-

Ortiz, 889 F.2d 301, 310-11 (1st Cir. 1989)).

The supervisory power has definite limits. See

Hasting, 461 U.S. at 505. For one thing, the supervisory power

doctrine is interstitial in the sense that it applies only when

there is no effective alternative provided by rule, statute, or

constitutional clause. See Chambers, 501 U.S. at 50-51. For

another thing, even when inherent powers legitimately can be

invoked, they must be exercised with restraint and

circumspection, both "because [they] are shielded from direct

regulated up to a certain point). In this connection, we note
that, although some courts of appeals have attempted to subdivide
the supervisory power into three categories ranged along a
continuum according to their degree of necessity, and,
concomitantly, the extent to which they may be subject to
congressional limitation, see In re Stone, 986 F.2d 898, 901-03

(5th Cir. 1993); Eash, 757 F.2d at 562-63, the Supreme Court has

expressly declined to adopt this taxonomy, see Chambers, 501 U.S.

at 48 n.12.

9

democratic controls," Roadway Express, 447 U.S. at 764, and

"[b]ecause of their very potency," Chambers, 501 U.S. at 44.

In particular, it is inappropriate for courts to

attempt to use the supervisory power to justify an extreme remedy

when, short of such heroic measures, the means are at hand to

construct a satisfactory anodyne more narrowly tailored to the

objective. See Hasting, 461 U.S. at 506 (overturning use of

supervisory power to deter prosecutorial misconduct through

reversal of conviction). It is equally inappropriate for a court

to gear up the supervisory power in an effort to circumvent a

limitation firmly established under conventional doctrine. See

Bank of Nova Scotia v. United States, 487 U.S. 250, 254-55 (1988)

(overturning use of supervisory power to evade the harmless error

inquiry; United States v. Payner, 447 U.S. 727, 735-36 (1980)

(overturning use of supervisory power to craft a new exclusionary

rule designed to reach situations in which the constitutional

exclusionary rule is not triggered). Illustrating the same

point, this court has ruled it inappropriate to use the

supervisory power to redress misconduct that did not result in

harm, see Santana, 6 F.3d at 11 (citing cases), or that resulted

in harm to someone other than the complaining defendants, see id.

It has been squarely held that a court's array of

supervisory powers includes the power to assess attorneys' fees

against either parties or their attorneys in befitting

situations. See Roadway Express, 447 U.S. at 764-67; In re

Cordova Gonzalez, 726 F.2d 16, 20 (1st Cir. 1984). The Court

10

recently reaffirmed this rule, see Chambers, 501 U.S. at 49, and

clarified its contours. While a court may invoke its supervisory

power to assess fees only when the fees are intended as a

sanction responding to a display of bad faith, the bad faith may

occur in connection with "a full range of litigation abuses."

Id. at 46. Moreover, even though a particular abuse is covered

by a specific statute or rule, a court still may invoke its

supervisory power to address the abuse if the existing remedial

provision is inadequate to the task. Id. at 50-51.

B. Sovereign Immunity.

The principle of sovereign immunity, in its primary

form, dictates that the United States may not be sued except with

its consent. This tenet was first stated, ipse dixit, by Chief

Justice Marshall in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264,

411-12 (1821) (dictum). It has been reaffirmed as recently as

this past term. See FDIC v. Meyer, 114 S. Ct. 996, 1000 (1994);

see also Gonsalves v. IRS, 975 F.2d 13, 16 (1st Cir. 1992) (per

curiam).

The secondary principle that monetary penalties cannot

be collected from the federal government absent its consent was

first articulated, in the narrow context of an assessment for

costs, in United States v. Hooe, 7 U.S. (3 Cranch) 73, 90-91

(1805). However, the Hooe Court made no explicit reference to

sovereign immunity, and it was not until four decades later that

the two principles formally converged, see United States v.

McLemore, 45 U.S. (4 How.) 286, 287-88 (1846). They have been

11

taken in tandem ever since in cases involving costs. See, e.g.,

United States v. Bodcaw, 440 U.S. 202, 203-04 n.3 (1979) (per

curiam); Fairmont Creamery Co. v. Minnesota, 275 U.S. 70, 73-74

(1927); United States v. Chemical Found., Inc., 272 U.S. 1, 20

(1926); Shewan v. United States, 267 U.S. 86, 87 (1925).

The Supreme Court recently removed any vestige of doubt

that may have lingered as to whether these cases envisioned

sovereign immunity as a bar not only to costs but also to

attorneys' fees.6 See Ruckelshaus v. Sierra Club, 463 U.S. 680,

685 (1983) (holding that, waiver aside, sovereign immunity bars

the shifting of attorneys' fees against the federal government)

(citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S.

240, 267-68 & n.42 (1975)). Since then, the proposition that

sovereign immunity bars the recovery of attorneys' fees has

become ensconced at the circuit level. See, e.g., In re Turner,

14 F.3d 637, 640 (D.C. Cir. 1994) (per curiam); In re Perry, 882

F.2d 534, 543-44 (1st Cir. 1989); Campbell v. United States, 835

F.2d 193, 195 (9th Cir. 1987); Ewing & Thomas, P.A. v. Heye, 803

F.2d 613, 616 (11th Cir. 1986). Civil and administrative

penalties against the government are subject to the same

prohibition, see, e.g., Department of Energy v. Ohio, 112 S. Ct.

1627, 1631 (1992), as is interest on (congressionally permitted)

6We think it is unlikely that such doubts were entertained
in earnest. After all, Congress would not have felt impelled to
enact the many statutes waiving immunity to attorneys' fees, see

1 Mary Frances Derfner & Arthur D. Wolf, Court Awarded Attorneys'

Fees 5.03[12][b] (1993) (cataloguing statutes), unless it

understood that, in the absence of such statutes, attorneys' fees
would not be recoverable against the federal sovereign.

12

court awards, see, e.g., Library of Congress v. Shaw, 478 U.S.

310, 314 (1986). Viewed against this austere backdrop, we think

it is fair to say that, by common understanding, the secondary

principle of sovereign immunity operates on the broadest possible

level: it stands as an obstacle to virtually all direct assaults

against the public fisc, save only those incursions from time to

time authorized by Congress.

Those who seek a deep understanding of the law's

profundities are likely to find sovereign immunity a frustrating

topic, for, from the very beginning, sovereign immunity has been

"accepted as a point of departure unquestioned," Cunningham v.

Macon & Brunswick R.R., 109 U.S. 446, 451 (1883), or, put another

way, simply taken at face value and "treated as an established

doctrine," United States v. Lee, 106 U.S. 196, 207 (1882).

Although we know relatively little, we do know that the doctrine

derives from the common law tradition that the king should be

insulated from suit absent his consent. See, e.g., Fairmont

Creamery, 275 U.S. at 73; see also Chisolm v. Georgia, 2 U.S. (2

Dall.) 419, 435-45 (1793) (Iredell, J., dissenting) (discussing

historical origins of doctrine). To be sure, this tradition

could not be transplanted root and branch into a system where

sovereignty was diffused both vertically (by federalism) and

horizontally (by the separation of powers). Accordingly, in

regard to the federal government, the law adapted the doctrine in

such a way that Congress inherited the king's sovereign role of

granting consent to be sued. See Chisolm, 2 U.S. at 436

13

(Iredell, J., dissenting). One consequence of this adaptation is

that executive officers lack the power to waive the federal

government's sovereign immunity. See United States v. Shaw, 309

U.S. 495, 501 (1940); Munro v. United States, 303 U.S. 36, 41

(1938); Chemical Found., 272 U.S. at 20-21.

Courts have mentioned two rationales for retaining the

adapted doctrine in a democratic society. Some judges have

theorized that it is necessary to protect the operations of

government from undue interference and financial embarrassment.

See, e.g., Larson v. Domestic & Foreign Commerce Corp., 337 U.S.

682, 704 (1949); Lee, 106 U.S. at 226 (Gray, J., dissenting); The

Siren, 74 U.S. (7 Wall.) 152, 154 (1868). Other judges, taking a

more positivist view of law, have suggested that the right to

recover against the government cannot exist unless the government

itself deigns to create such a right.7 See, e.g., Kawananakoa

v. Polybank, 205 U.S. 349, 353 (1907).

Regardless of whether sovereign immunity rests on

tradition, reason, or inertia, the doctrine is deeply entrenched

in American law. Withal, Congress has liberally exercised its

prerogative to abolish particular manifestations of the doctrine.

7For its part, the scholarly community has been
overwhelmingly hostile to the doctrine, often denouncing it as
mischievous formalism, see Kenneth Culp Davis, Suing the

Government by Falsely Pretending to Sue an Officer, 29 U. Chi. L.

Rev. 435, 436-38 (1962), with little basis in English history,
see Louis L. Jaffe, Suits Against Government and Officers:

Sovereign Immunity, 77 Harv. L. Rev. 1, 2-19 (1963), and

antithetical to the democratic spirit, see John E. H. Sherry, The

Myth that the King Can Do No Wrong, 22 Admin. L. Rev. 39, 56-57

(1969).

14

See, e.g., 28 U.S.C. 1346(b), 2671-2678, 2680 (Federal Torts

Claims Act) (subjecting the government to suit for various

torts); 28 U.S.C. 1346(a), 1491 (Tucker Act) (subjecting the

government to suit for damages in, inter alia, contract cases);

see also Derfner & Wolf, supra note 6 (listing statutes waiving

governmental immunity to claims for counsel fees in various

specialized contexts); cf. 18 U.S.C. 3006A (Criminal Justice

Act) (requiring government to pay counsel fees and other expenses

on behalf of indigent criminal defendants).

In considering legislation that is claimed to have the

effect of waiving sovereign immunity in a particular class of

cases, courts usually have been guided by two maxims. First, a

waiver of sovereign immunity must be definitely and unequivocally

expressed. See United States v. Mitchell, 445 U.S. 535, 538

(1980); In re Perry, 882 F.2d at 544. The Court has gone so far

as to suggest that the unequivocal expression must appear in the

text of the statute itself. See United States v. Nordic Village,

Inc., 112 S. Ct. 1011, 1016 (1992); Ardestani v. INS, 112 S. Ct.

515, 520 (1991). Second, a waiver of sovereign immunity always

is to be construed strictly in favor of the federal government,

and must not be enlarged beyond such boundaries as its language

plainly requires. See Nordic Village, 112 S. Ct. at 1014-15;

Ruckelshaus, 463 U.S. at 685; In re Perry, 882 F.2d at 544.

Applying these tests, several courts have held that

monetary sanctions for litigation abuse are not barred by

sovereign immunity in certain classes of cases on the theory that

15

an enacted statute, typically the Equal Access to Justice Act

(EAJA), 28 U.S.C. 2412 (allowing prevailing parties to recover

fees from the government in certain civil and administrative

proceedings), serves to waive the government's immunity. See,

e.g., M. A. Mortensen Co. v. United States, 996 F.2d 1177, 1181-

82 (Fed. Cir. 1993) (holding that the EAJA works a waiver of

immunity sufficient to allow the imposition of fees under Fed. R.

Civ. P. 37); In re Good Hope Indus., Inc., 886 F.2d 480, 482 (1st

Cir. 1989) (same, in respect to fees under 28 U.S.C. 1912 and

Fed. R. App. P. 38); Adamson v. Bowen, 855 F.2d 668, 672 (10th

Cir. 1988) (same, in respect to monetary sanction under Fed. R.

Civ. P. 11); United States v. Gavilan Joint Comm'y Coll. Dist.,

849 F.2d 1246, 1251 (9th Cir. 1988) (similar); see also Schanen

v. United States DOJ, 798 F.2d 348, 350 (9th Cir. 1985) (imposing

monetary penalty against government under Fed. R. Civ. P. 60(b)

without addressing sovereign immunity); United States v. National

Medical Enters., Inc., 792 F.2d 906, 910-11 (9th Cir. 1986)

(upholding penalty against government imposed under Fed. R. Civ.

P. 37(b) without addressing sovereign immunity). Two panels in

the Ninth Circuit have suggested that the Civil Rules themselves,

having been authorized by Congress, may provide the basis for a

waiver of sovereign immunity. See Mattingly v. United States,

939 F.2d 816, 818 (9th Cir. 1991) (discussing Fed. R. Civ. P.

11); Barry v. Bowen, 884 F.2d 442, 444 (9th Cir. 1989) (same).8

8At least one writer has expressed grave reservations about
these decisions. See Timothy J. Simeone, Comment, Rule 11 and

Federal Sovereign Immunity: Respecting the Explicit Waiver

16

At the same time, monetary penalties under court rules

have been found to be barred by sovereign immunity in other

contexts. See, e.g., United States v. Woodley, 9 F.3d 774, 781-

82 (9th Cir. 1993) (holding that neither a local rule nor Fed. R.

Crim. P. 16(d)(2) works a waiver). And, moreover, even though a

federal statute, 18 U.S.C. 401, confers broad powers upon

federal district courts to punish contumacious conduct,9 most

courts continue to hold that sovereign immunity bars court-

imposed fines for contempt against the government. See Coleman

v. Espy, 986 F.2d 1184, 1191-92 (8th Cir. 1993) (holding that

compensatory contempt sanctions are barred by sovereign

immunity); Barry, 884 F.2d at 444 (holding that coercive contempt

sanctions are barred by sovereign immunity); see also McBride v.

Coleman, 955 F.2d 571, 576-77 (8th Cir. 1992) (dictum; expressing

grave doubt that compensatory contempt sanctions can override

Requirement, 60 U. Chi. L. Rev. 1043, 1052-57 (1993) (criticizing

cases employing the narrow and broad rationale alike as
inconsistent with the Court's rigid adherence in recent years to
the unequivocal expression requirement).

9The statute provides:

A court of the United States shall have power
to punish by fine or imprisonment, at its
discretion, such contempt of its authority,
and none other, as
(1) Misbehavior of any person in its
presence or so near thereto as to obstruct
the administration of justice;
(2) Misbehavior of any of its officers in
their official transactions;
(3) Disobedience or resistance to its
lawful writ, process, order, rule, decree, or
command.

18 U.S.C. 401.

17

sovereign immunity). But see Armstrong v. Executive Office of

the Pres., 821 F. Supp. 761, 773 (D.D.C. 1993) (holding, without

undertaking any waiver analysis, that a coercive contempt

sanction is not barred by sovereign immunity).

To our knowledge, no court has considered on the merits

the applicability of sovereign immunity to a monetary penalty

assessed under the judiciary's supervisory power in a criminal

case.10

III. ANALYSIS

In this case, the doctrines of sovereign immunity and

supervisory power, each formidable in its own right, are in

unavoidable tension.11 Despite the fact that, in recent years,

10Although the district court in Woodley shifted fees

against the government partially in reliance on its supervisory
power, the Ninth Circuit overturned the fee award, reasoning on
this issue that the availability of other sanctions precluded the
court from unleashing its supervisory power. See Woodley, 9 F.3d

at 781-82. The ensuing dictum to the effect that sovereign
immunity does not bar fee-shifting under the supervisory power,
see id. at 782, is both gratuitous and unsupported.

Our research has also unearthed an occasional near
miss. For example, in Andrulonis v. United States, 724 F. Supp.

1421, 1537 (N.D.N.Y. 1989), aff'd in part, rev'd in part on other

grounds, 924 F.2d 1210 (2d Cir. 1991), vacated on other grounds,

112 S. Ct. 39 (1992), the court granted a motion for sanctions
against the federal government made under Rule 11, 28 U.S.C.
1926, and the court's inherent powers, without specifying the
source for the sanction imposed. See also United States v.

Prince, 1994 U.S. Dist. LEXIS 2962 at *1-*4 (E.D.N.Y. 1994)

(withdrawing assessment of jury costs against U.S. Attorney's
Office under court's supervisory power, in the face of a motion
for reconsideration arguing constraints imposed by sovereign
immunity).

11We see no way to avoid this tension by upholding the fee
award on an alternative ground. While government counsel's
disobedience and deception of the court perhaps could have been
punished under the contempt statute, 18 U.S.C. 401, and the
entire fiasco, if conceived as a discovery violation within the

18

the domain of sovereign immunity has tended to contract and the

domain of supervisory power has tended to expand, we believe that

sovereign immunity ordinarily will trump supervisory power in a

head-to-head confrontation. The critical determinant is that the

doctrines are of fundamentally different character: supervisory

powers are discretionary and carefully circumscribed; sovereign

immunity is mandatory and absolute. Consequently, whereas the

former may be invoked in the absence of an applicable statute,

the latter must be invoked in the absence of an applicable

statute; and whereas the former may be tempered by a court to

impose certain remedial measures and to withhold others, the

latter must be applied mechanically, come what may. In other

words, unlike the doctrine of supervisory power, the doctrine of

sovereign immunity proceeds by fiat: if Congress has not waived

the sovereign's immunity in a given context, the courts are

obliged to honor that immunity. See, e.g., Meyer, 114 S. Ct. at

ambit of Fed. R. Crim. P. 16(b)(2), might have been punishable
under the broadly worded sanction authority of Fed. R. Crim. P.
16(d)(2), these possibilities afford no hope of averting a head-
on collision between judicial power and sovereign immunity. In
the first place, the district court's order made it pellucid that
supervisory power comprised the sole foundation on which the
monetary sanction rested. See Horn, 811 F. Supp. at 753-54. We

will not go behind such a determination and speculate what the
court might (or might not) have done had it analyzed the
prosecutor's misconduct under a different standard. See R.W.

Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 19 (1st Cir.

1991). In the second place, neither section 401 nor Criminal
Rule 16 offer a vehicle powerful enough to overrun sovereign
immunity. See Woodley, 9 F.3d at 781-82 (holding that Fed. R.

Crim. P. 16 does not work a waiver of sovereign immunity); Espy,

986 F.2d at 1191 (holding that 18 U.S.C. 401 does not work a
waiver of sovereign immunity). Thus, dressing the district
court's decision in different, less confrontational garb would
not sidestep the imminent doctrinal clash.

19

1000.

The government tells us that this is precisely such a

case: since Congress has not acted, the government's immunity to

fee awards in criminal cases remains intact. At first blush, the

conclusion seems sound. We are able to discern only three

avenues by which appellees arguably might tip-toe around this

result. We trace each of these routes.

The most obvious detour around the barrier presented by

sovereign immunity depends on waiver. If appellees can identify

some statute or rule, and show that Congress thereby lifted the

federal government's sovereign immunity in this particular

context, they would have an unobstructed path. But there is no

such statute or rule applicable here and appellees, to their

credit, do not pretend that one exists.

The second detour embodies the assumption that, in

appropriate cases, the judiciary possesses the naked power to

override sovereign immunity. We believe that this avenue is a

dead end. One of the main purposes of sovereign immunity is to

guard against judicial interference in executive functions, see

Larson, 337 U.S. at 704, and the notion of a judicial override

operating ex proprio vigore would largely frustrate this purpose.

In any event, the proposed detour runs headlong into a stone

wall: Congress, not the courts, is the government's authorized

representative for purposes of waiving sovereign immunity. See

supra p.13 and cases cited; see also Hans v. Louisiana, 134 U.S.

1, 21 (1890) (declaring that, because the "legislative department

20

of a State represents its polity and its will," "the legislature,

and not the courts, is the judge" of when sovereign immunity

ought be waived).

A third possible route around the barrier is to argue

that, for whatever reason, the federal government's sovereign

immunity does not extend to monetary sanctions, such as punitive

fee awards, levied under a court's supervisory power. It is this

avenue that appellees most vigorously explore. Shorn of

rhetoric, they assert three basic reasons why the shield of

immunity does not cover such situations. We mull each reason in

turn.

1. Reward v. Punishment. Appellees assert that, for
1. Reward v. Punishment.

purposes of sovereign immunity, the law historically has

precluded fee-shifting only when it is employed as a reward to

prevailing parties and not when it is employed as a punishment

for litigation abuse. This foray suggests that what we have

called the secondary principle of sovereign immunity the tenet

holding that the government is immune to monetary penalties

imposed in court cases precludes fee-shifting only when the

shifted fees are intended to reward a prevailing party, and not

when they are meant to reprimand a misbehaving party.

Appellees starts out on solid ground in the sense that

the older cases discussing the secondary principle of sovereign

immunity all involved monetary awards to prevailing parties

directly attributable to litigatory success. See, e.g., Fairmont

Creamery, 275 U.S. at 73-74; McLemore, 45 U.S. at 288. But those

21

cases were cases involving costs (or fees taxable as costs) and

costs always have been awarded to prevailing parties, at least in

the court's discretion.12 Because costs are invariably taxed

pursuant to a statute (or a rule having statutory force) that

provides for the award, the fact that they are routinely awarded

against the government in civil cases (under 28 U.S.C. 2412) is

of no assistance to the appellees in this case.

Once we move beyond the realm of costs to attorneys'

fees, appellees' argument makes very little sense. Apart from a

statute or rule so providing, counsel fees cannot be shifted as a

reward to a prevailing party in any case, civil or criminal,

whether or not the government is the fee target. See Alyeska

Pipeline, 421 U.S. at 247 (limning "American rule"). Taking into

account the ground rules of American litigation, appellees'

argument must mean that sovereign immunity bars fee awards

against the government only when the fees are assessed under a

12At early common law, costs were awarded to prevailing
parties as a matter of course in all cases. See Arthur L.

Goodhart, Costs, 38 Yale L.J. 849, 851-53 (1929). Before the

adoption of the Civil Rules, costs were generally awarded to
prevailing parties as a matter of right in actions at law, and at
the judge's discretion on the equity side. See Ex parte

Peterson, 253 U.S. 300, 317-18 (1920). In modern practice, costs

are commonly taxed against non-prevailing parties in civil cases,
see Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437,

441 (1987); In re Two Appeals Arising out of the San Juan Dupont

Plaza Hotel Fire Litig., 994 F.2d 956, 962-64 (1st Cir. 1993);

see also Fed. R. Civ. P. 54(d), although the judge retains some

discretion, see In re Two Appeals, 994 F.2d at 962.

Theoretically, costs are similarly taxable against convicted
defendants in criminal cases, see 28 U.S.C. 1918(b), although

the actuality is seldom seen. The statute listing categories of
costs generally available, 28 U.S.C. 1920, applies to both
civil and criminal cases. See United States v. Procario, 361

F.2d 683, 684 (2d Cir. 1966) (per curiam).

22

fee-shifting statute or rule. But the case law is arrayed

against appellees' position, for the courts have never structured

the secondary principle of sovereign immunity in such an odd

configuration. Cf., e.g., id. at 267-68 (stating without

qualification that fee awards against the government, "if

allowable at all, must be expressly provided for by statute").

What is more, a number of courts, ruling on comparable bad-faith

sanctions, have either held that sovereign immunity applies, see

supra pp. 16-17, or taken for granted that sovereign immunity

would apply absent a waiver, see supra pp. 15-16.13

The straw that snaps the camel's back is that the

appellees have offered no plausible explanation why the shield of

immunity should leave the government exposed to fee awards

designed as sanctions for litigation abuse, but simultaneously

protect it from fees or other monetary awards routinely given to

prevailing parties as virtual bonuses to reward litigatory

success. The simple, unarguable fact is that any and all such

fee awards would deplete the public coffers, and, consequently,

13In this regard, fines for civil contempt under 18 U.S.C.
401, quoted supra note 9, are of special interest because

contempt originated as an aspect of the supervisory power, see

Shillitani v. United States, 384 U.S. 364, 370 (1966), and it

continues to serve essentially "the same purpose" as do sanctions
imposed under the supervisory power in respect to litigants' and
lawyers' bad-faith tactics, Chambers, 501 U.S. at 53 (citation

omitted). The better reasoned decisions hold that, when the two
doctrines lock horns, contempt is barred by sovereign immunity.
See supra p. 17. Although these decisions have little bearing

here because they turn, explicitly or implicitly, on statutory
interpretation, they do show that the principle of immunity to
monetary damages is understood by thoughtful courts to sweep
broadly.

23

they all must stand on the same footing vis-a-vis principles of

sovereign immunity. It follows inexorably that, absent a statute

or rule effectuating a waiver, the secondary principle of

sovereign immunity bars fee-shifting awards against the

government, whatever their intended purpose.

2. The Eleventh Amendment Analogy. It is "settled
2. The Eleventh Amendment Analogy.

that an award of attorney's fees ancillary to prospective relief

is not subject to the strictures of the Eleventh Amendment."

Missouri v. Jenkins, 491 U.S. 274, 279 (1989); see also Fortin v.

Commissioner, 692 F.2d 790, 797-98 (1st Cir. 1982) (holding, on

same theory, that avoidable fines for contempt against the State

are not barred by the Eleventh Amendment). Appellees urge us to

extend this exception to the law of federal sovereign immunity.

Although this idea is not original, see McBride, 955 F.2d at 582

(Lay, C.J., concurring and dissenting) (making similar

suggestion), embracing it would entail a leap of faith that we

are unwilling to take.

The Eleventh Amendment focuses exclusively on an

immunity shared by the several States. See U.S. Const. amend.

11; see also Hans, 134 U.S. at 10-11 (explicating text of

Eleventh Amendment). Freely transposing Eleventh Amendment

exceptions to the precincts patrolled by principles of federal

sovereign immunity would create a dysfunctional jurisprudential

motley and, moreover, would constitute an impermissible deviation

from a course previously charted by the Court. Jenkins, the very

case bruited by appellees, definitively rejects the argument they

24

advance. There, the Court explained that, had the controversy

"dealt with the sovereign immunity of the Federal Government,"

then in such event there would have been "no prospective-

retrospective distinction as there is when . . . it is the

Eleventh Amendment immunity of a State that is at issue."

Jenkins, 491 U.S. at 282 n.4; see also In re Shafer, 146 B.R.

477, 480 n.6 (D. Kan. 1992) (echoing Jenkins footnote).

3. Separation of Powers. Appellees' final contention
3. Separation of Powers.

is that stripping away the power to assess monetary penalties in

criminal cases would leave courts defenseless against litigation

abuses committed by the government which is, after all, a party

to every criminal case in the federal system and thereby would

offend the separation of powers. See McBride, 955 F.2d at 582

(Lay, C.J., concurring and dissenting) (developing similar

thesis); cf. Chilcutt v. United States, 4 F.3d 1313, 1327 (5th

Cir. 1993) (making comparable suggestion in significantly

different context; upholding monetary sanction levied against

federal prosecutor personally). This contention seriously

overstates the case, and, in all events, asks us to do Congress's

work.

The fact that sovereign immunity forecloses the

imposition of monetary sanctions against the federal government

in criminal cases does not leave federal courts at the mercy of

cantankerous prosecutors. Courts have many other weapons in

their armamentarium. This case aptly illustrates the point. The

district judge ordered, among other things, the removal and

25

quarantine of the lead prosecutor, the suppression of tainted

documents, and the advance disclosure of the government's trial

strategy. In addition, the judge could have ordered the lead

prosecutor to pay the accumulated fees, see Chilcutt, 4 F.3d at

1319 (upholding order that government counsel pay, inter alia,

for time spent by defense counsel at contempt hearing, without

being reimbursed); United States v. Sumitomo Marine & Fire Ins.

Co., 617 F.2d 1365, 1370-71 (9th Cir. 1980) (upholding imposition

of monetary sanction for discovery abuse against government

attorney as the "only available target for such sanctions"), but

did not see fit to do so.14 He also could have ordered the

prosecutor to attend ethics seminars at her own expense, see

Chilcutt, 4 F.3d at 1319, dispatched her to the Justice

Department's internal disciplinary office, see Hasting, 461 U.S.

at 506 n.5, or publicly reprimanded the Justice Department

itself, see United States v. Prince, 1994 U.S. Dist. LEXIS 2962

at *1-*4 (E.D.N.Y. 1994).15 While this list is not exhaustive,

we are confident that it shows beyond serious question that the

court had ample means at its disposal, even without fee-shifting,

14There would seem to be no sovereign immunity bar to
imposing a monetary penalty as a sanction against a rogue
attorney merely because she happens to represent the federal
government. See Larson, 337 U.S. at 693 (noting that sovereign

immunity does not protect federal officials in the performance of
acts that are unconstitutional or beyond their statutory
authority); see also Chilcutt, 4 F.3d at 1327; Sumitomo Marine,

617 F.2d at 1370-71.

15Although the district court eschewed these additional
remedies, the Justice Department later engaged its internal
disciplinary mechanism on its own initiative.

26

to catch the Justice Department's attention, punish the culprit,

and deter future prosecutorial excesses.

Of course, there is a more broadly focused reason why

the separation-of-powers argument will not wash. While sovereign

immunity may marginally limit the courts' ability to function,

there is nothing sacrosanct about the courts' power to impose

sanctions. Congress has wide-ranging authority to limit

supervisory powers generally. See Chambers, 501 U.S. at 47.

This includes the authority to place restrictions on courts'

inherent power to shift fees. See Alyeska, 421 U.S. at 259

(recognizing "inherent power in the courts to allow attorneys'

fees in particular situations, unless forbidden by Congress").

It also includes the authority to regulate the courts' inherent

power in respect to contempt. See 18 U.S.C. 401, quoted supra

note 9. Circumscription of the fee-shifting power by the

application of an ancient (but still viable) common law doctrine,

subject to waiver through congressional action, comprises no

greater insult to the independence of the Judicial Branch.

Our last response to appellees' separation-of-powers

argument is to note its indeterminacy. The same argument could

be, and has been, turned 180 degrees. At least one highly

respected scholar maintains that sovereign immunity "furthers the

separation of powers by limiting judicial oversight of executive

conduct . . . [and thus] avoid[ing] situations where the courts

will impose orders on the other branches of government that might

be disregarded." Erwin Chemirinsky, Federal Jurisdiction

27

9.2.1, at 545-46 (2d ed. 1994) (emphasis supplied).

We will not paint the lily. Neither policy nor

precedent supports the proposition that the separation of powers

requires taking the quantum leap essayed by the court below.

Leaving monetary imposts to one side, the range and reach of

other sanctions, remedial and punitive, that are available to

federal criminal courts permit those courts to administer their

dockets and conduct judicial business with a sufficiently free

hand. Courts, like litigants, must abide by certain rules and

to the extent that sovereign immunity curbs judicial power, the

restraint is tolerable in the constitutional sense. In the last

analysis, then, appellees' contention that criminal courts are

left impotent if they are deprived of the power to shift fees as

a sanction against the government is as empty as a mendicant's

purse.

To summarize, none of the various possible detours

manage to bypass the barrier of sovereign immunity. We hold,

therefore, that fee-shifting against the government can be

accomplished only in conjunction with the passage of a statute

(or a sufficiently explicit rule having the force of a statute)

that authorizes such an award. In the absence of such an

enactment, the secondary principle of sovereign immunity saves

the federal government harmless from all court-imposed monetary

assessments, regardless of their timing and purpose.

IV. APPELLATE JURISDICTION

We have one more bridge to cross. It is hornbook law

28

that a court cannot act in the absence of subject matter

jurisdiction; and that, when such jurisdiction is lacking, a

court is obliged to note the defect on its own initiative. See

United States v. Pierro, F.3d , (1st Cir. 1994) [No.

93-1313, slip op. at 13-14]; In re Recticel Foam Corp., 859 F.2d

1000, 1002 (1st Cir. 1988); see also American Policyholders Ins.

Co. v. Nyacol Prods., Inc., 989 F.2d 1256, 1258 (1st Cir. 1993).

Thus, even though the appellees have not questioned the existence

of appellate jurisdiction, we must pursue the point. Parties

cannot confer subject matter jurisdiction on either a trial or an

appellate court by indolence, oversight, acquiescence, or

consent.

A. Appeal as of Right.

The Appellate Rules require that an appellant's brief

contain "a statement of the basis for jurisdiction in the court

of appeals . . . with reference to the applicable facts to

establish such jurisdiction." Fed. R. App. P. 28(a)(2)(ii).

Complying, perhaps, with the letter of the rule, but not with its

spirit, the government's brief states in a purely conclusory

fashion only that its appeal is authorized under 28 U.S.C. 1291

(1988).16 Despite this blithe assurance, the government's

entitlement to an appeal as of right under section 1291 is

problematic. We explain briefly.

16The statute provides in pertinent part, with exceptions
not relevant here, that "the courts of appeals . . . shall have
jurisdiction of appeals from all final decisions of the district
courts of the United States . . . ." 28 U.S.C. 1291.

29

An appeal by the government in a criminal case must be

specifically authorized by statute. See United States v. Sanges,

144 U.S. 310, 312 (1892). The appeal before us does not fit

neatly into the confines of 18 U.S.C. 3731 (affording the

United States a right of appeal from certain described orders in

criminal cases, e.g., orders dismissing indictments, suppressing

evidence, or mandating the return of seized property), or any

more specialized statute conferring a right of appeal on the

government in criminal cases, e.g., 18 U.S.C. 3742(b)

(permitting the United States to appeal from certain sentencing

determinations). And it is settled that, at least in the absence

of very special circumstances, the general authorization

contained in section 1291 is not sufficiently specific to

authorize an appeal by the government in a criminal case. See,

e.g., Arizona v. Manypenny, 451 U.S. 232, 246-47 (1981) (citing

cases); United States v. Patterson, 882 F.2d 595, 599 (1st Cir.

1989), cert. denied, 493 U.S. 1027 (1990).

Notwithstanding this looming obstacle to appellate

jurisdiction under section 1291, we believe that this case

involves a sufficiently special set of circumstances to engage

the exception rather than the rule. Some courts have suggested

that, under what we choose to call the "special circumstance"

exception, a government appeal may be entertained in a criminal

case on the authority of section 1291 if the appeal satisfies the

conditions of the so-called collateral order doctrine. See,

e.g., Carroll v. United States, 354 U.S. 394, 403 (1957)

30

(dictum); Patterson, 882 F.2d at 599; United States v. Powers,

622 F.2d 317, 319-20 n.2 (8th Cir.), cert. denied, 449 U.S. 837

(1980). Application of the collateral order doctrine is "limited

to orders that (1) conclusively determine (2) important legal

questions which are (3) completely separate from the merits of

the underlying action and are (4) effectively unreviewable on

appeal from a final judgment." Doughty v. Underwriters at

Lloyd's, London, 6 F.3d 856, 862 (1st Cir. 1993); see also Cohen

v. Beneficial Loan Corp., 337 U.S. 541, 546 (1949) (originating

doctrine). We think that these conditions are met in this case.

Moreover, the particular circumstances at hand,

especially the procedural posture in which this appeal arises and

the nature of the relief sought, are conducive to allowing the

appeal to go forward. In criminal cases, the policy against

permitting appeals to be taken too freely is heightened by speedy

trial and double jeopardy concerns. See Will v. United States,

389 U.S. 90, 96 (1967); DiBella v. United States, 369 U.S. 121,

126 (1962). Here, those concerns do not come into play at all:

the determination of the defendants' guilt has been made,

sentence has been imposed, the attempted appeal is not

interlocutory in any sense, and no prospect of piecemeal

litigation endures.

We conclude, therefore, that we have jurisdiction over

the instant appeal under 28 U.S.C. 1291. We emphasize,

however, that our holding is a narrow one. Rather than importing

the collateral order doctrine lock, stock, and barrel into our

31

criminal jurisprudence, we hold only that when, as now, the

conditions of the collateral order doctrine are satisfied,17

and the prudential concerns that traditionally militate against

allowing the government to appeal in a criminal case favor, or

are at least neutral in respect to, the availability of a

government appeal, then section 1291 affords a vehicle through

which the government may seek appellate review in a criminal

case.

B. Mandamus.

We are fortified in our resolve to hear and determine

this appeal by the knowledge that, even if no appeal lies as of

right, we possess and can appropriately exercise the power of

discretionary review, via mandamus,18 to address the important

question raised in this case.

17We are not the first court to deem an assessment against
the government qua prosecutor to be a collateral order for

jurisdictional purposes. See United States v. Baker, 603 F.2d

759, 761-62 (9th Cir. 1979) (per curiam) (entertaining government
appeal, under section 1291, from district court's Rule 15(c)
assessment against government of deposition-related attorneys'
fees); United States v. Rogalsky, 575 F.2d 457, 459 (3d Cir.

1978) (entertaining government appeal, under section 1291, from
district court's assessment against government of costs arising
from psychiatric examination of indigent defendant, see 18 U.S.C.

3006A); but see In re Attorney General, 596 F.2d 58, 61 (2d

Cir.) (holding that contempt fine for discovery abuse against
U.S. Attorney General is not a collateral order for purposes of
section 1291), cert. denied, 444 U.S. 903 (1979).

18Technically, this case calls for the issuance of a writ of
prohibition rather than a writ of mandamus. Because prohibition
is simply the obverse of mandamus the two writs derive from the
same source, see 28 U.S.C. 1651, and incorporate the same

standards we often use the two terms interchangeably. See In

re Pearson, 990 F.2d 653, 656 (1st Cir. 1993); Recticel, 859 F.2d

at 1005 n.4. We do so here.

32

A federal court of appeals has the power to treat an

attempted appeal from an unappealable (or possibly unappealable)

order as a petition for a writ of mandamus or prohibition under

the All-Writs Act, 28 U.S.C. 1651 (1988). See, e.g., United

States v. Sorren, 605 F.2d 1211, 1215 (1st Cir. 1979); see also

United States v. Collamore, 868 F.2d 24, 27 (1st Cir. 1989)

(proceeding under mandamus powers where doubt existed as to

propriety of asserting mandatory appellate jurisdiction).

Mandamus is ordinarily appropriate in those rare cases in which

the issuance (or nonissuance) of an order presents a question

anent the limits of judicial power, poses some special risk of

irreparable harm to the appellant, and is palpably erroneous.

See In re Pearson, 900 F.2d 653, 656 & n.4 (1st Cir. 1993);

Recticel, 859 F.2d at 1005-06; see also Mallard v. United States

Dist. Court, 490 U.S. 296, 308-09 (1989). In a still smaller

class of cases, mandamus may lie even though all the usual

standards are not met. See In re Arvedon, 523 F.2d 914, 915 (1st

Cir. 1975); In re Ellsberg, 446 F.2d 954, 956-57 (1st Cir. 1971);

see generally 16 Charles A. Wright et al., Federal Practice and

Procedure 3934 (1977 & Supp. 1994). This tiny class of cases

involves what we have come to call advisory mandamus.19

19We think it is wise to distinguish supervisory mandamus
from advisory mandamus. The former is used when an appellate
court issues the writ to correct an established trial court
practice that significantly distorts proper procedure. See,

e.g., United States v. Kane, 646 F.2d 4, 9 n.7 (1st Cir. 1981);

Grinnell Corp. v. Hackett, 519 F.2d 595, 599 (1st Cir.), cert.

denied, 423 U.S. 1033 (1975); see also La Buy v. Howes Leather

Co., 352 U.S. 249, 256-60 (1957). This differs from advisory

mandamus in that, far from being novel, the problem sparking

33

Advisory mandamus has its roots in the Court's

reference to mandamus review of "basic, undecided question[s]."

Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964). It is

appropriate when the issue presented is novel, of great public

importance, and likely to recur. See In re Justices of Supreme

Court of Puerto Rico, 695 F.2d 17, 25 (1st Cir. 1982). Advisory

mandamus is not meant to allow review of "interstitial matters of

case administration," Recticel, 859 F.2d at 1006, or to

circumvent limits on appellate review of discretionary

interlocutory rulings, see Sorren, 605 F.2d at 1216. Rather,

advisory mandamus is reserved for big game. It "should primarily

be employed to address questions `likely of significant

repetition prior to effective review,' so that our opinion would

assist other jurists, parties, or lawyers." In re Bushkin

Assocs., Inc., 864 F.2d 241, 247 (1st Cir. 1989) (citation

omitted).20

supervisory mandamus has by definition manifested itself on many
occasions.

20Because situations that properly call for the use of
advisory mandamus "are hen's-teeth rare," In re Bushkin, 864 F.2d

at 247, relatively few prototypes exist. This is not to say that
the writ has fallen into desuetude. See, e.g., In re Globe

Newspaper Co., 920 F.2d 88, 90 (1st Cir. 1990) (issuing writ of

mandamus directing district court to grant members of press
access to jury list, on theory that issue presented was
"sufficiently novel and important" to warrant review); In re

Justices, 695 F.2d at 25 (indicating that advisory writ of

prohibition is an appropriate means by which to direct district
court not to hear facial challenges to rules governing bar
membership and dues); see also Nasuti v. Scannell, 906 F.2d 802,

811 n.15 (1st Cir. 1990) (suggesting advisory mandamus would be
appropriate to clarify status of federal employee immunity under
amendments to Federal Tort Claims Act).

34

If no right of appeal were to exist, the case before us

today would be a prime candidate for advisory mandamus. The

issue presented has never before been squarely decided; yet, it

is likely to recur, given the pervasiveness of litigation abuse

in modern practice. There is a sufficient showing of irreparable

harm in the sense that, were no court to entertain either an

appeal or a petition for mandamus, the matter might perpetually

evade review. Finally, the issue bears importantly on the

relationship between the Judicial Branch and the Executive

Branch.

We regard the case for mandamus here as especially

compelling because it is important in the right way. It poses an

elemental question of judicial authority involving precisely

the sort of "Article III-type jurisdictional considerations" that

traditionally have triggered mandamus review. In re Justices,

695 F.2d at 25; see also In re Pearson, 990 F.2d at 656 (noting

that mandamus historically has been used to check judicial

usurpation of power); In re Attorney General, 596 F.2d 58, 64 (2d

Cir.) (granting mandamus relief due in part to "separation of

powers overtones"), cert. denied, 444 U.S. 903 (1979).

In short, we believe that this attempted appeal, if not

entertainable as of right under 28 U.S.C. 1291, would present a

classic case for the granting of advisory mandamus. Either way,

the government is entitled to the relief that it seeks.

V. CONCLUSION

Having satisfied ourselves that appellate jurisdiction

35

inheres, we now recapitulate. We agree with the lower court that

the government committed egregious acts of prosecutorial

misconduct. We do not believe, however, that the court had the

right to ignore sovereign immunity in responding to that

misconduct. The court's supervisory power, although potent,

cannot intrude, unaided, into the sovereign's protected

preserves.

We need go no further. Because principles of sovereign

immunity bar a federal court from invoking its supervisory power

to compel the federal government to pay attorneys' fees and costs

as a sanction for prosecutorial misconduct in a criminal case, we

reverse the orders of the district court insofar as they purport

to shift such fees and costs. All parties shall bear their own

costs in this court.

Reversed. No costs.

36