Rachel BAUCHMAN, By and Through her parent and guardian Cheryl BAUCHMAN, Plaintiff,

v.

WEST HIGH SCHOOL; Salt Lake City School District; Richard Torgerson; William Boston; Gene Bonella; Teresa Piele; Dolores Riley; Darline Robles; Dale Manning; and Mary Jo Rasmussen, Defendants,

Liela Quinones Barela, By and Through her father, Luke J. Barela; Luke J. Barela in his own capacity; Tamra M. Badger, by and through her parent and guardian, William A. Badger; William A. Badger in his own capacity; Cindy R. Badger; Eric Michael Nielsen, By and Through his parent and guardian Greg Nielsen; Greg Nielsen in his own capacity; Jo Rita Nielsen; Heather Pettit, By and Through her parent and guardian, Ralph Pettit; Ralph Pettit in his own capacity; Elaine Pettit; Joy M. Warthen, By and Through her parent and guardian, Lee Warthen; Alexander B. Warthen, By and Through his parent and guardian, Lee Warthen; Lee Warthen in his own capacity; Barbara Warthen; Steven C. Eror, Jr., By and Through his parent and guardian, Steven C. Eror; Steven C. Eror in his own capacity; Judy H. Eror; Jane Curtis, By and Through her parent and guardian, Marvin R. Curtis, Jr.; Marvin R. Curtis in his own capacity; and Joan C. Curtis, Defendant Intervenors.

Civ. No. 95–C–506G.

United States District Court, D. Utah, Central Division.

Nov. 21, 1995.

Andrew C. Hruska, New York City and H. Thomas Stevenson, Ogden, UT, for Plaintiffs.

John E.S. Robson and James F. Wood, Salt Lake City, UT, for Defendants.

## REPORT AND RECOMMENDATION AND FINDINGS OF FACT

J. THOMAS GREENE, District Judge.

In furtherance of an Order issued on August 25, 1995, by the Tenth Circuit Panel, the undersigned judge of this court, as though a Special Master, conducted proceedings concerning the Petition of Rachel Bauchman pending before the Tenth Circuit for civil contempt of officials of Salt Lake City's West High School and the Superintendent of the Salt Lake School District. Expedited proceedings were conducted over a three day period—October 25-27, 1995. The parties had submitted proposed findings and trial briefs prior to the hearing, and were permitted to file post-hearing memorandums, which were received on November 6, 1995, after which the matter was taken under advisement. Prior to the hearing, pretrial conferences with counsel were held to define the scope of the proceedings and establish limitations on discovery.[1]

The scope of inquiry at the hearing, in addition to claimed damages of plaintiff, was to determine whether defendants should be held to be in civil contempt for alleged violation of the injunction issued by the Tenth Circuit Panel on June 6, 1995, which enjoined the appellees-defendants from the perfor-

---

1. Counsel submitted proposals for discovery which this court felt were overly broad, unnecessarily extensive and cumulative. An Order was entered on September 7, 1995, concerning scope and limitations, and further orders were entered consistent therewith. Plaintiff was permitted to take 10 depositions and defendants collectively were permitted 10 depositions. Further depositions, expansion into collateral matters, inquiries essentially about the merits of the underlying civil rights litigation, and inquiries in time frames prior to and after June 6-7 were not permitted, except as such might relate directly to defendants' alleged contempt. *See Maggio v. Zeitz*, 333 U.S. 56, 59, 68 S.Ct. 401, 403, 92 L.Ed. 476 (1948) (discussing the "long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy"). Otherwise, discovery would have been unreasonably and unnecessarily extensive.

mance of two songs at the West High School graduation ceremonies which were held at Symphony Hall in Salt Lake City the evening of June 7, 1995.[2]

## BACKGROUND

In late May 1995, plaintiff—a Jewish girl who was a sophomore student and a member of the West High A'Cappella Choir during the school year 1994–95—filed a lawsuit claiming violation of her civil rights essentially because of perceived overly Christian religious content of songs in the choir repertoire and singing of choir songs in religious venues. Plaintiff sought a Temporary Restraining Order to prohibit the singing of the two songs which the Choir had prepared for graduation: "Friends" and "The Lord Bless You and Keep You." At a hearing before the United States District Court for Utah on June 2, 1995, at which hearing the undersigned judge presided, the motion for TRO was denied. By Order dated June 6, 1995, a Tenth Circuit Panel reversed the district court order and retained jurisdiction over the matter as an injunction pending appeal.[3] Notwithstanding the Circuit Court injunctive order, the audience of over two-thousand persons, including many parents, current and former students, as well as many of the A'Cappella Choir members, interrupted the graduation ceremonies to sing the song "Friends" at the conclusion of the choir's performance of the two songs which had been substituted in the place of the songs prohibited by the Tenth Circuit injunctive order. After the singing, the graduation ceremonies and program were resumed.

Plaintiff filed the pending Petition for Adjudication of Contempt with the Tenth Circuit over one month after the graduation ceremony, on July 18, 1995. The Tenth Circuit panel assigned to review the contempt petition remanded the matter to this court directing that proceedings be conducted, and that this court, "as though a Special Master," make findings of fact and submit those findings together with a report and recommendation for disposition to the Honorable Tenth Circuit Court of Appeals. Accordingly, the following Findings of Fact and Recommendation for Disposition are made and entered by the undersigned judge.

## FINDINGS OF FACT

1. The injunction order of the Tenth Circuit (hereinafter "injunction") was entered in Denver at 3:30 p.m. on June 6, 1995. It provided as follows:

> Appellees are hereby enjoined from the performance of the songs, "The Lord Bless You and Keep You" and "Friends" by the a cappella choir class at the West High School graduation ceremonies.

2. The injunction was communicated by telephone to the Salt Lake City School District in the afternoon of June 6, 1995, and immediately was made known to Superintendent Darline Robles who notified William Boston, Principal of West High. The injunction was widely published on radio, television and the newspapers. All of the defendants, including Richard Torgerson, Choir Director, learned of the injunction from the news media or otherwise by the early morning of June 7, 1995.

3. The Salt Lake City Board of Education had a meeting the evening of June 6, 1995, and voted to abide by the injunction and not to seek further appeal. The following resolution was adopted that night and widely disseminated by the media:

> This afternoon the Salt Lake City School District learned that two judges of the Tenth Circuit Court of Appeals disagreed

---

**2.** Defendants Dolores Riley, Dale Manning, Mary Jo Rasmussen and Teresa Piele were dismissed from the contempt proceedings by stipulation of the parties prior to the evidentiary hearing, and no evidence was presented against them at the hearing. The remaining defendants are William Boston, Principal of West High School; Gene Bonella, Vice Principal; Richard Torgerson, Choir Director, Darline Robles, Superintendent Salt Lake City School District; West High School; and the Salt Lake City School District.

**3.** The issue raised by counsel for defendants as to whether the Tenth Circuit has jurisdiction to maintain a continuing appeal after reversal of the District Court's order denying a Temporary Restraining Order, and to issue a contempt order emanating from such retention of jurisdiction, is not a matter before this court, so no recommendation relating thereto is submitted.

with Judge Green's ruling, and in a two-paragraph decision stated that, based on the facts before them, they would grant an injunction.

The Board has reviewed our options to seek immediate appeal of the Tenth Circuit decision. It is unlikely that any review would be completed before tomorrow night's graduation. To avoid further uncertainty about the graduation ceremonies and to allow the students, their loved ones, and the community to celebrate the achievements of the West High graduates, I hereby move that the board not seek immediate review of the Tenth Circuit decision and that the A Capella choir be requested to sing other musical selections from its repertoire.

4. All of the defendants had some intimation but no actual knowledge that students and others might stand in protest of the injunction or attempt to sing the song "Friends" at the graduation exercises, or before or after the graduation exercises. Rumors were publicized in the media that students might try to sing the song "Friends" either outside or inside the symphony hall. (*See* Video Tape Exhibit PX–2; Audio Tape Exhibit PX–10.) The chairperson of the graduation committee, Lorraine Hargraves, and principal Boston had reason to believe that students intended to sing the song before or after the graduation ceremonies on the plaza or in the building, apart from the actual graduation ceremonies. They let it be known to students that singing apart from the graduation ceremonies would be satisfactory. Very near the actual time of choir singing, within minutes of the performance, a rumor was communicated to Lorraine Hargraves, who notified Choir Director Torgerson that the singing might occur during the exercises.

5. Plaintiff and her mother, Cheryl Lynn Bauchman, believed that students would sing "Friends" the night of the graduation, and had heard rumors that students were developing four alternative plans as to when and how to sing the song. A schoolmate of Rachel called her with that information just before plaintiff and her mother were leaving for Abravanel Hall. Plaintiff and her mother

made no attempt to contact school officials about the matter.

6. In anticipation that a possible disruption could occur at graduation, defendants put into place the following precautionary measures:

*William Boston* (West High School Principal)

a. At a rehearsal on June 6 of graduating seniors at the West High field house, before the Tenth Circuit injunction order was entered, Boston announced to all graduating seniors and choir members present that whatever ruling was made by the court of appeals it would be followed and obeyed.

b. Principal Boston reviewed and prepared to implement existing plans to prevent disruptions—which were already in place as to school dances, football games, etc.

c. On the night of June 6, Principal Boston intended to cancel singing altogether for the graduation exercises on June 7. He so informed Mr. Torgerson the morning of June 7. Mr. Torgerson was upset because he felt that the choir should be allowed to sing some songs. The Salt Lake Board of Education had resolved the night before to request the choir to sing other musical selections from its repertoire. It was agreed between Mr. Boston and Mr. Torgerson that Torgerson should suggest a list of songs which could be sung as substitute songs. Mr. Torgerson supplied a handwritten list to Mr. Boston within an hour, and suggested "The Last Rose of Summer" and "Consecrate the Day" as appropriate substitutes. Exhibit S–4. This was agreed upon.

d. Mr. Boston conferred with Superintendent Robles on June 7 in the morning and explained to her that the songs in question would not be sung and that the choir director would be practicing substitute songs with the choir in preparation for the graduation exercises that evening.

e. Principal Boston and Superintendent Robles talked to Choir Director Torgerson and made firm arrangements for substitute songs suggested by Mr. Torgerson to be sung. There was a clear understanding that the choir director would rehearse those substitute songs and not the original songs with

the choir and lead those substituted songs at the graduation ceremonies.

f. Mr. Boston discussed the situation with Vice Principal Bonella, Graduation Chairperson Lorraine Hargraves and the other defendants. All had specific and demanding assignments to perform relative to the graduation, and it was understood that Mr. Boston would assume primary responsibility to take steps to comply with the Tenth Circuit injunction. In addition to the security officer normally in attendance at graduation, Principal Boston procured a second security officer. Boston arranged coordination of two security officers supplied by the school with the several security officers supplied by symphony hall.

g. Principal Boston talked to graduating seniors and the senior members of the A'Cappella Choir about the importance and necessity to comply with the court injunction at the final rehearsal in the afternoon of June 7. He made clear that the injunction would be complied with, and told students what possible penalties and sanctions could be imposed, including non-graduation, if the injunction were violated. He also asked the seniors to so advise the junior and sophomore members of the choir.

i. Principal Boston talked to students in hallways and the plaza at symphony hall, and encouraged full compliance with the injunction. None of the students or teachers indicated any displeasure for the injunction to Boston. He was reasonably satisfied that there would be voluntary compliance. He encouraged and thought he had student support for singing the song "Friends" after the ceremonies.

j. Very shortly before the ceremonies were to begin, Mr. Boston received a copy of the sheet music for "Friends" at the door to Abravanel Hall, which was being handed out by a student. He informed Dr. Robles of the handout, and discussed the matter with Robles, Bonella, and Piele. It was determined that Mr. Boston would prepare a directive which would be announced if a disturbance arose, which Boston proceeded to do.

*Darline Robles* (Superintendent of Salt Lake City Schools)

a. Ms. Robles determined the evening of June 6 to go to the West High graduation rehearsal the next day and asked Mr. Manning to accompany her. She so advised Principal Boston. The purpose was to meet Mr. Torgerson because she knew the changing of songs would be difficult. She wanted to assist the school.

b. Superintendent Robles called an evening meeting of the Salt Lake Board of Education on June 6, 1995, after being notified of the Tenth Circuit injunction. A press release was issued that the injunction would be complied with, as previously described.

c. After arriving at Abravanel Hall, Ms. Robles was informed by a security guard of rumors of a disturbance. In response, Ms. Robles reviewed the situation with Principal Boston including plans to comply with the injunction. She met with security officers at Symphony Hall and other school personnel. In conferences with Mr. Torgerson on June 7, she approved the substitute songs for performance by the choir and told him to use his influence as an instructor to discourage students from singing the songs forbidden by the Tenth Circuit injunction. Torgerson indicated that he would do so.

*Lorraine Hargraves* (Chairperson of Graduation Committee)

a. Ms. Hargraves gave remarks stressing law and order and decorum at the rehearsal of graduating seniors in the field house of West High on June 6 and at the final rehearsal in Abravanel Hall on June 7.

b. Ms. Hargraves encouraged choir director Torgerson to talk to students to make it clear that only the substitute songs would be sung, and just before the singing by the choir told him of rumors that members of the choir intended to sing "Friends." Mr. Torgerson had already distributed a note to choir members indicating that he would be directing the two substitute songs.

*Richard Torgerson* (Choir Director)

a. Mr. Torgerson felt it was his obligation to comply with the injunction. He believed that giving a written note would be the best way to make his wishes known to student .

choir members and to make perfectly clear his determination to lead and direct only the two substitute songs which had been rehearsed in the place of the originally designated songs.

b. Mr. Torgerson prepared a note instructing choir members what songs were to be sung. A copy of the note was passed out on each choir row just before the singing. Mr. Torgerson set forth the following in his note to choir members:

> Superintendent Darline Robles has approved two new songs for A'Capella to sing. They are "The Last Rose of Summer" and "Consecrate the Day." These are the songs I will be directing tonight and ask your cooperation in performing these numbers.—Mr. T

Exhibit D–TOR–1.

c. Mr. Torgerson substituted a secular song for a religious song originally scheduled to be sung by the West High School Chorale group (a subgroup of the A'Cappella Choir). The originally designated song was not the subject of the injunction, but substitution was made by Torgerson in the spirit of the injunction.

d. Mr. Torgerson rehearsed substituted songs which he had selected for the A'Cappella choir to sing in lieu of the original enjoined songs.

e. Mr. Torgerson directed choir in singing substituted songs and gave a signal to choir to sit down after the second song was completed.

f. Mr. Torgerson was telephoned by a parent, Preston Naylor, just before leaving home to go to Symphony Hall for the graduation ceremonies on June 7. He was told that "this thing is out of control" with reference to possible actions by students in singing the song "Friends," and was advised that he ought to have nothing to do with it and "might even leave" if something should occur. Mr. Torgerson expressed his disapproval of any such actions by students to Mr. Naylor. After arriving at Symphony Hall about 15 minutes before the scheduled performance, Mr. Torgerson circulated the note he had prepared to the choir, and thereafter

was contacted by Lorraine Hargraves just before the choir sang with a rumor that students planned to sing "Friends." Mr. Torgerson took no further action as a result of Hargraves' contact because he had already taken action by passing and distributing the explicit note of instruction to the choir. Torgerson wrote the note the way he did because he wanted it to be positive—to tell the choir what they can do and what they will do—and not to dwell on the negative.

g. Mr. Torgerson knew nothing about the note written by Mr. Warthen which was circulated to choir members after Mr. Torgerson's note had been distributed.

h. Mr. Torgerson felt and believed that he did comply with the letter and the spirit of the injunction. In later review of his actions by Superintendent Robles, the determination was made that Mr. Torgerson had substantially complied with instructions to discourage the singing of originally designated songs by replacing them and specifically instructing choir members to sing those songs which he would lead and direct.

i. Mr. Torgerson summarized what he did in order to comply with the injunction: (1) agreed not to lead choir in singing original 2 songs; (2) substituted two other songs for the original two songs; (3) rehearsed with A'Cappella choir in preparation for singing the two substituted songs; (4) prepared note of instruction to students and distributed it to students about 15 minutes before the performance; (5) directed singing of the two substitute songs for A'Cappella; (6) in the spirit of the injunction, replaced an original song of the Chorale group which had religious undertones with a substituted song (even though he did not understand the injunction to so require); (7) made copies of the note and distributed these to the choir members. Mr. Torgerson distributed the note to each row of choir members so that all of them would have an opportunity to review it.

j. At end of the choir singing of the substitute songs, Torgerson gave a command to the choir to sit.[4] In his deposition he had

---

4. Several witnesses testified that the signal by

Mr. Torgerson to the choir to sit down was

testified that he had forgotten to give the signal to sit, but on review of the video tapes he realized that in fact he had given the signal, and so indicated in signing his deposition. Getting off the legs of the chair on which he was standing three or four rows back from the stage, at end of the singing of the substituted songs, Torgerson bent down and touched the chair for balance and then walked out of the auditorium. Walking up the hall toward the lobby of Abravanel Hall, he heard commotion, and about two-thirds of the way up the hallway could hear and see that the audience and students were singing "Friends." While in the lobby, Torgerson heard that Samantha Riesenfeld, a Jewish member of the A'Cappella choir, had left the graduation ceremony. Torgerson left Abravanel Hall and went to the Riesenfeld residence to console Samantha in the presence of her parents and urge her to return to get her diploma. By the time Torgerson returned to Abravanel Hall, the graduation ceremony had just concluded.

7. Under the totality of the circumstances, the foregoing actions by the defendants constituted the taking of all reasonable steps to insure compliance with the injunction and were calculated to achieve substantial compliance with the terms of the injunction.

8. All defendants acted in good faith in taking all reasonable steps to comply with the Tenth Circuit injunction.

9. When the disruption by the singing of the song "Friends" occurred, the following actions were taken by defendants, which actions were taken in good faith and were adequate and reasonable under the circumstances to achieve substantial compliance with the injunction even though it became apparent that defendants were unable to stop the audience from singing:

*William Boston*

a. Mr. Boston announced to audience that the Tenth Circuit injunction prohibited singing the song "Friends." This was just after the audience had been encouraged by Will Badger, an unauthorized student non choir member to sing the song "Friends." The student had said that it was a tradition at West High to sing "Friends" at graduation, but "this year by court order the choir may not sing it." He had then asked "everyone" in the audience "who know the song" to "join us in singing it." (Exhibit D–TOR–20. *See* Rosenblatt video tape, Exhibit D–TOR–6). After Mr. Boston took the microphone and advised the audience about the injunction, he was unable to deliver the rest of the directive which he had prepared because his words were drowned out by the noise and singing of the audience.

b. Mr. Boston physically muffled the microphone in an attempt to secure it from the student who was using it and to prevent further statements.

c. The singing of the song by the audience was loud and grew louder. Mr. Boston stood before the audience all through the singing of the song, in obvious disapproval, in an attempt to regain decorum. The audience was uncontrollable at that point and virtually nothing could be done beyond what Mr. Boston did.

d. Mr. Boston announced after the singing that diplomas would be handled out immediately. He had determined that the atmosphere was such that the talk he had prepared would not be given and that the entire program should be dispensed with.

unusual in that it was not slow and deliberate as was his custom. Mr. Boston said he had seen such miscues by Mr. Torgerson before. One student testified that the signal was clear and not unusual. At the conclusion of the last substitute song, Mr. Torgerson gave a one arm salute or wave to the audience acknowledging applause— to the right and to the left. He then unmistakably gave a down signal with both arms to the choir. The positioning of standing on two arms of chairs may have caused the signal to be less than slow and deliberate. (*See* Video Tape Exhibits D–TOR–6 and D–TOR–7). Plaintiff Rachel

Bauchman swore in a "Verified Supplemental Pleading" filed with the Tenth Circuit in support of her civil contempt petition that "Torgerson waived both hands in the air and left the podium." (Pl's.V.Supp.Pldg. at ¶ 7). At the hearing, plaintiff testified that she had looked away after Torgerson finished leading the last song, and when she turned around he was gone. (10/25/95 Tr. 23). In any event, the video tapes make it clear that after two salutes to the audience with one hand, Torgerson gave the signal to the choir with both hands to be seated. (*See* Exhibits D–TOR–6 and D–TOR–7).

Superintendent Robles dissuaded him from that course of action and the program was resumed without further incident.

### Darline Robles

a. Superintendent Robles determined not to further disrupt and inflame audience by abandoning the entire program. Accordingly, she advised Principal Boston to resume and to reinstate the program after the song "Friends" was sung.

b. Superintendent Robles felt that if she got up and said anything about "circus atmosphere," or some similar comment, it would only add to tension and would make an already uncontrollable situation worse.

### Lorraine Hargraves

Ms. Hargraves went to piano and forced student Jenny Naylor, a junior student choir member, to stop playing "Friends." She pushed her off the piano bench, then put her arm around Jenny's waist and removed her from the stage.

### Gene Bonella

Mr. Bonella attempted to disconnect microphone after it had been grabbed by student who made the unauthorized announcement. Bonella put his arm around the errant student and escorted him off the stage and into the custody of a security guard.

10. None of the defendants planned, managed, assisted in the planning or participated in any plan for the singing of the song "Friends" at the West High School graduation ceremonies on June 7 1995.

11. None of the defendants actually encouraged the A'Cappella choir, students or the audience in the singing. None of the defendants acted in such a way to assist or facilitate in implementation of a plan or intended course of conduct by anyone to violate the Tenth Circuit injunction by singing the song "Friends" at the graduation exercises.

12. The actions of the students were insufficient to establish an agency relationship with defendants or any school officials, and there was no evidence to support that the students were in conspiratorial alignment or otherwise acting in concert with defendants.

13. Plaintiff presented no evidence and no evidence otherwise was before the court that defendants Boston, Bonella, Robles or Torgerson, or any other defendants, did anything affirmatively to support or promote the audience or students or the A'Cappella choir in singing "Friends."

14. The singing of the song "Friends" was not a performance as such by the A'Cappella choir in that it was sung during an interruption of the graduation ceremony. Moreover, it was general singing by the audience, joined in by the choir. Although only a few of the A'Cappella members appeared to be sitting down and not participating, the singing was by the whole audience acting as a unit and not as a performance by the A'Cappella choir as such.

15. Each of the defendants (Defendant Torgerson had left the auditorium when the disruption occurred) acted reasonably in response to the disruption of the graduation exercises when the song "Friends" was sung. The said defendants took all reasonable steps available to them and acted in good faith to achieve substantial compliance with the injunction.

16. After the audience, non-choir members of the graduating class on the stage, and former and present choir members started to sing "Friends," defendants were not able to comply or force others to comply with the injunction. The situation was out of control in the sense that the audience could not have been stopped by reasonable actions of defendants from singing the song.

17. The song "Friends" was sung by most of the entire audience of approximately 2000 persons, including parents, former West High students, students from all classes and many members of the A'Cappella Choir. The following forces and circumstances combined to cause and create the phenomenon of the singing of the song "Friends" at the graduation exercises of West High School on June 7, 1995, and created a situation beyond the control of defendants and rendered them unable to prevent the audience, graduating seniors, and members of the A'Cappella choir from singing:

a. Many students were frustrated and angry about being prevented from singing the traditional songs which had been rehearsed

for the graduation ceremonies. There was a generally shared feeling of having lost a one-time opportunity to show camaraderie and love for the 360 seniors who were graduating as "Friends." A radio commentator in a live interview on the plaza just outside Abravanel Hall with many students and others while at the final rehearsal was going on inside expressed his anger "that the kids can't sing the song in the ceremony." (Audio Tape of KSL's Doug Wright Radio Show, Exhibit PX–10). This generally shared feeling of unfair repression figured in the equation of why many students and others reacted the way they did.

b. Although most students were respectful of Plaintiff Rachel Bauchman's rights, including her right to protest, there was a general perception that she was being used as a pawn by her father, Eric Bauchman, in the assertion of unreasonable demands not truly meant as protective of Rachel but to "sterilize the school district from any religion," including the singing of Christmas carols. Whatever the ultimate truth or falsity of such perception, it figured in the equation of why many students and others reacted the way they did.

c. Many students, former students and other persons who were to comprise the audience at the graduation exercise believed in good faith that the injunction did not apply to students, members of the audience, or individual members of the A'Cappella choir. They also had and maintained a good faith interpretation of the injunction that for them to sing the song "Friends" would be a legitimate and permissible exercise of freedom of expression.

d. Many parents were supportive and sympathetic with their student children and did not discourage but rather joined in the singing.

e. There was a confrontation between Mrs. Bauchman and Bonnie Catenzaro, the student choir president, just before the final choir rehearsal in the hallway leading into Symphony Hall on the afternoon of June 7. (Rachel Bauchman Tr. at 14.) (Mrs. Bauchman said the confrontation occurred after the choir rehearsal. Cheryl Bauchman Tr. at 96. Bonnie Catenzaro said it occurred right before the seniors lined up to go onto the stage. Bonnie Catenzaro Tr. at 157.) Bonnie Catenzaro was a very soft spoken and tearful witness at trial. Mrs. Bauchman is an aggressive, articulate and commanding person, and so presented herself at trial and at Abravanel Hall when the confrontation occurred. Mrs. Bauchman testified that as she and Rachel entered symphony hall students were in the hallway and in the auditorium, constituting a good portion of the graduating class. She perceived that she and Rachel were being observed by students with "500 eyes staring in hostility." (C. Bauchman Tr. at 91.) She sought out the student president of the choir and wanted to know where Rachel was to sit, to which Ms. Catenzaro responded and explained the seating arrangements. Rachel appeared reluctant to participate in the rehearsal, and this exchange occurred: *Ms. Catenzaro:* "Is Rachel going to sing with us tonight?" *Mrs. Bauchman:* "Of course she is. You are not singing the songs that offend her." *Ms. Catenzaro:* "I wouldn't be too sure of that," to which Mrs. Bauchman responded and "called me a b-i-t-c-h and said she was going to go call up the district." (Catenzaro Tr. at 157, 158.) Bonnie testified that this shocked her and that she felt bad for Rachel. (*Id.*) According to Rachel, the student choir president asked Mrs. Bauchman, "Well, what are you going to do to us if we decide to sing the song 'Friends'?" (R. Bauchman Tr. at 14) Mrs. Bauchman testified that she was affronted by the remark, and admitted that in a "challenging" way said: "Please—Make my day!" The exchange apparently occurred where other students were present. According to Mrs. Bauchman and Rachel, Mr. Torgerson was in the immediate area, but there was no evidence that if he knew of the exchange he said or did anything. Mrs. Bauchman thought Mr. Torgerson may have overheard the heated remarks because "[t]he man is not deaf." (C. Bauchman Tr. at 132.) The confrontation was not reported to the district or any school official by Mrs. Bauchman. It is more likely than not that graduating students generally knew of the confrontation, that it was regarded as a challenge or dare to them concerning singing the song, and that at least in part

their actions were in response to the challenge.

f. Jonathan Brinton, the student valedictorian—a very articulate and popular person—departed from his prepared and preapproved text. His parents had returned that afternoon from China and he drew a comparison between the suppression of human rights in Tienenan Square and the suppression of the right of free expression which derived from the Tenth Circuit injunction. He said that the A'Cappella choir's right to sing "two beautiful songs" has been "temporarily taken away," and then said to the audience, "May God bless each and every one of us." The audience stood and loudly applauded and expressed great support and approval of the sentiments expressed.

g. One parent whose daughter was distraught, Lee Warthen—a person trained in the law—felt that the injunction did not apply to the students, that they were free to sing and that they should determine to do so. He went to the Abravanel Hall on the afternoon of June 7 before the graduation and had discussions with several groups of students and advised them of their rights of free expression, including student lead spontaneous singing. This became an extremely popular point of view among many students, and bolstered a growing student based spirit of determination to sing "Friends," because of the concept and interpretation that they were free to express themselves by singing the song in the exercise of their constitutional rights of free expression.

h. Sheets with the words of the song "Friends" were distributed to persons arriving for the gradation ceremonies just before the ceremonies began the evening of June 7. Several hundred sheets were distributed to persons as they entered Abravanel Hall to attend the graduation exercises. Copies of the song had been reproduced and were distributed by students, with no involvement or prior knowledge by the defendants. Mrs. Bauchman received such a sheet as she entered Abravanel Hall but did not contact school officials about it. Mr. Boston received such a sheet but believed it was intended for singing after the graduation ceremonies were over.

i. Lee Warthen, the person who had met with the students and told them of their right to sing—that this was a constitutional right they had—wrote a note and made 50 copies. This note was passed out by his daughter, a graduating senior, to choir members when they were lining up for the final formation to sing, just before the exercises began. The note said:

> Mr. Boston or another official is going to try to stop you from singing. Whatever anybody does, don't stop singing. Give it all you've got. We're all behind you.

(Exhibit D–TOR–2). No evidence was presented that any defendant or faculty member was aware of this note.

j. When the unauthorized non-choir member student who had expropriated the microphone encouraged everyone to join together to sing "Friends"—he said that everyone should sing, not as "Jews, Christians or Moslems" but as "Friends." (Exhibit D–TOR–20). He asked the audience and everyone who knew the song to join in singing because the choir by court order was not allowed to do so. At or about that point the parent who had caused the aforesaid note to be passed stood from his seat three or four rows back from the platform. He addressed the choir and loudly said "come on guys, let's sing, let's do it."

k. Singing started in the left section of the audience. (Boston Tr. at 17). This quickly spread throughout the audience, joined by graduating seniors who were not choir members on the stage and most of the choir members. Although some choir members sat down after Mr. Torgerson gave the signal to sit, most remained standing and all but a few of the choir joined in the singing as did most of the audience. The singing was loud—it was compelling—and virtually was a full blown action by the great majority of all persons present. None of the defendants joined in the singing. Plaintiff described the singing as "really loud," constituting a "mob scene" in which the students and audience "acted as a unit." (R. Bauchman Tr. at 43, 44). At least one member of the faculty who was sitting in the audience as a parent of a graduating senior—not in academic regalia—

stood with the rest of the audience as a parent supporting his student graduate.

l. By the time the invitation to sing "Friends" was announced, the atmosphere was one of not to be denied enthusiasm. There was no anarchy, but there was united and heartfelt singing of a song known and traditionally sung on graduation occasions. The audience was out of the control of Principal Boston or any of the defendants. It was beyond the power or possible containment by defendants until after the song was over.

m. Several videotapes of the graduation ceremonies document the events of the evening, including the enthusiasm and loudness of the audience, choir director Torgerson's motion to the choir to be seated after the substitute songs were sung, Mr. Boston's attempt to advise the audience not to sing because of the injunction, the escorting of the errant student off the stage by Mr. Bonella, the removal of a student from the piano bench by graduation committee chairperson Hargraves, the widespread participation by the audience, the unauthorized remarks of valedictorian Brinton, the invitation by the non-choir student Badger who asked the audience to join in singing the traditional song "Friends" because the A'Cappella choir had been told not to sing by court order, remarks of students about the two notes passed out just before the singing and the general atmosphere of the occasion. (*See, e.g.,* Video Tape Exhibits D–TOR–4, 5, 6, and 7 (Plaintiff's submitted identical exhibits to D–TOR–4, 5, and 6; D–TOR–7 is a slow motion depiction of Video Tape Exhibit D–TOR–6 showing Defendant Torgerson's motion to choir to sit down)).

18. The facts presented and before the court indicate that there was no agency, collusion or conspiracy between any defendant and students who arranged for singing the song "Friends." Several alternative plans had been discussed by the students, but nothing had been finalized and the situation was in flux and not solidified until very late in the day. The alternative possible courses of action and the actions finally decided upon and taken were kept from defendants.

19. By the time the song "Friends" was sung at the graduation ceremonies, the audience and students involved were acting in a good faith belief and interpretation of the court injunction that it did not apply to them and that they had a right to sing as an exercise of their right of free expression under the Constitution.

20. None of the defendants by clear and convincing evidence participated in violation of the injunction or encouraged others to do so.

21. None of defendants, contrary to allegations of plaintiff filed with the district court in the underlying proceeding as well as the Tenth Circuit in furtherance of the Petition for Adjudication of Contempt, "willfully or maliciously acquiesced" in or supported violation of the injunction or otherwise actually encouraged the singing of the song "Friends" at the West High School graduation ceremonies held on June 7, 1995, in violation of the Tenth Circuit injunction.

22. Plaintiff Rachel Bauchman suffered no physical damage or injury, or monetary loss or expense.[5] She was not taken to see a doctor for any emotional upset or otherwise. As she was leaving the hall graduation night she was angry, disgusted and depressed. Her mother said that she was very, very hurt, angry and mad as well as totally depressed, and that she cried uncontrollably when they reached the automobile.[6]

## RECOMMENDATION

In a civil contempt proceeding, plaintiff has the burden of proof to establish a

---

5. Rachel testified that she believed her civil rights had been violated, although she knew she could opt out and not sing the song "Friends" which she had practiced on several occasions without objection, and knew of the policy explained by Mr. Torgerson which permitted non-participation in any song performance which might be offensive without any prejudice to grades.

6. Emotional distress is not compensable in a civil contempt proceeding. *See McBride v. Coleman,* 955 F.2d 571, 577 (8th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992) (civil contempt is not an appropriate vehicle for awarding damages for emotional distress and does not constitute a comprehensive device for redressing private injuries); *In re Walters,* 868 F.2d 665, 670 (4th Cir.1989).

prima facie case by clear and convincing evidence, i.e., that defendants violated the injunction and that plaintiff sustained compensable damages as a result of that violation. *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir.1995); *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir.1992).

■ Defendants may assert a defense to civil contempt by showing by clear and convincing evidence that "all reasonable steps" were taken in good faith to ensure compliance with the court order and that there was substantial compliance, *Spectra Sonics Aviation, Inc. v. Ogden City*, 1991 WL 59369 (10th Cir. Apr. 19, 1991); *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977), or relatedly by proving "plainly and unmistakably" defendants were unable to comply with the court order. *Brock v. Burgett Greenhouses, Inc.*, No. 85–2818, 1988 WL 143834, at *3 (10th Cir. Mar. 31, 1988). *See also United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). In a case such as this, involving a discrete occasion and not a long-term or multi-phase decree, the relevant inquiry is whether all reasonable steps were taken in good faith and that defendants were unable to comply.[7]

■ Based upon all of the facts and circumstances, and having observed the demeanor of witnesses and assessed credibility, this court is persuaded that no defendant violated the Tenth Circuit injunction. There was no clear and convincing evidence to that effect. On the other hand, there was clear and convincing evidence to the effect that defendants took all reasonable steps to insure compliance with the injunction and that they all acted in good faith to achieve substantial compliance with the injunction. The defendants were faced with a situation wherein there was an inability to comply with the injunction or cause others to comply after the singing of "Friends" began, even though all defendants acted in good faith to do everything reasonably possible to comply. There was no agency, conspiracy or collusion between defendants and the students or audience. By its terms the injunction did not apply to the audience, former or present students, or individual members of the A'Cappella choir. In any event, the audience, students and parents acted in a good faith and reasonable interpretation of the injunction, that it did not apply to them and that they had a constitutional right to express themselves by singing the song.

This court, acting as though a Special Master, recommends to the Honorable Tenth Circuit that the petition for contempt of court be dismissed and that plaintiff be awarded no damages, attorneys fees or costs of court.

---

**7.** After taking all reasonable steps to ensure compliance, substantial compliance, otherwise required to establish the defense, would be excused if by clear and convincing evidence the enjoined defendants are unable to comply. This court reasons that the standard of all *reasonable* steps must be interpreted in the context of the overall circumstances in the day-and-a-half immediately preceding the West High School A'Cappella Choir's performance at the graduation ceremonies. Other *possible* steps, when viewed singly, appear to be reasonable. However, when all steps are analyzed in light of the totality of the circumstances, the diminishing value of additional possible steps makes them incrementally less reasonable.